JUDGE PAULEY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

DOTAN NEWMAN, pro se,
MICHAEL ZAMANSKY, pro se,
R. DAVID WEISSKOPF, pro se,
EITAN ELIAHU, pro se,
DAN SILBERMAN, pro se,

                Plaintiffs

VS.

JEWISH AGENCY FOR ISRAEL,   NEW ISRAEL FUND,
JEWISH FEDERATIONS OF NORTH AMERICA, NA'AMAT,
WOMEN'S INTERNATIONAL ZIONIST ORGANIZATION,
PEF ISRAEL ENDOWMENT FUND, TZIPI LIVNI,
SHMUEL CHAMDANI, NA'AMA BOLTIN,
MIRIAM DARMONY, AVIGAIL YALUMI,
EINAT GILEAD-MESHULAM, TOMER MOSKOWITZ,
CLANIT BERGMAN, JOHN HAGEE,
INTERNATIONAL FELLOWSHIP OF CHRISTIANS & JEWS,
JERUSALEM INSTITUTE OF JUSTICE, CARY SUMMERS,

                Defendants.

**16 CV 7593**

COMPLAINT
**JURY TRIAL
DEMANDED**

2016 SEP 28   PM 1:34
S.D. OF N.Y.
U.S. DISTRICT COURT
FILED

COMES NOW, Plaintiffs, pro se, for their Complaint against the Defendants, and state as follows:

A.   **INTRODUCTION**

1.   With utter disdain for the rule of law, Defendants are responsible for orchestrating one of the largest ongoing racketeering schemes in American history whereby they channel billions of dollars through this District from all over North America to fund systematic nationwide extortion and enslavement of over 80,000 divorced fathers since 2009, including the Plaintiffs.  The Defendants specifically target protect-class minorities, including the Plaintiffs, who lack sufficient resources to fend off deadly extortion rackets.

2.     Defendant Livni exploited Israeli diplomatic missions, including the Israeli Consulate in New York, as shell enterprises to redirect private money into the the Administrator General and Official Receiver Office.   Private money from this district was then co-mingled with other funds, some of which funded the Debt Collections Office.   Under Defendant Livni's authority, the Debt Collections Office acted under color of law to extort illegal debts from over 80,000 divorced fathers from protected-class minority groups in Israel; including the Plaintiffs.

3.     Defendants, together with the Israeli police and judiciary, and acting with other agents and co-conspirators have, in the past and continuing through the present, used force and intimidation to silence any opposition to their activities in Israel which includes the destruction of families, divorces, kidnapping children from their fathers, forcing men into destitution with illegal debts, false and arbitrary arrests, knowingly putting divorced fathers into life-threatening situations, including the Plaintiffs, and causing the wrongful death of Plaintiff Weisskopf's grandmother, an American citizen from New York who was never in Israel.

4.     There are two categories of Defendants in this action – Those who deprived the Plaintiffs of their constitutional and human rights and financial Defendants who serve as shell entities to misdirect private funds to corrupt governmental, quasi-governmental, and non-governmental entities in Israel. Defendants Darmony, Yalumi, Boltin, Gilead-Meshulam, Bergman repeatedly deprived the Plaintiffs of their constitutional and human rights. Defendants Livni, Chamdani, and Moskowitz acted under color of law to obstruct investigations into crimes committed by Defendants Yalumi, Boltin, Gilead-Meshulam, Bergman.   Defendants JAFI, JFNA, Na'amat, WIZO, NIF, PEF, JIJ, IFCJ, Hagee and Summers financed the deprivation of Plaintiffs' human rights and other men similarly situated individuals.   Defendants targeted Plaintiffs for extortion because of their gender, national origin, citizenship, and other protected-class statuses.

5.      The fact that the victims of the Defendants' misconduct included the handicapped, the elderly, and impoverished protect-class minorities who deserved justice and fairness only exacerbates the venality of the Defendants' conduct.  Instead of due process, thousands of victims, who are the most vulnerable in society, were victims of unprecedented lawlessness that within their hearings got swept away in handcuffs and shackles into "civil" jails since no crimes were committed.  The abuse and trauma these victims suffered at the hands of the Defendants has dramatically changed the trajectory of many of their lives.

6.      Defendants have shamed the face of justice; violated the Law of Nations, international law, the laws of Israel, the laws of the United States of America and of individual states, including but not limited to New York, and the natural laws of man; and the Racketeer Influenced Corrupt Organizations Acts (RICO).

## B.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because six of the Defendants have addresses in New York, while the rest of the Defendants and Plaintiffs have addresses in various separate localities.  Plaintiff Weisskopf's grandmother, whose wrongful death was caused by the Defendants' actions and/or omissions, was from the Bronx, New York.

8.      The Court has jurisdiction over Plaintiffs' claim under the Racketeer Influenced and Corrupt Organization Act (RICO) 18 U.S.C. 1961 *et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable Court deems just and proper under all circumstances which have occasioned this amended complaint.

9.      The Court has jurisdiction over Plaintiffs' claim subject to RICO 18 U.S.C. §§ 1964(a) and (c).

class religious minority and is the biological father of Minors; L (age 12), N (age 10), and M (age 8) with legal parental rights.

20.     Plaintiff Eliahu is a citizen of the United States and Israel whose service address is 7162 Galli CT at San Jose, CA 95129.  He is a protected-class racial minority and the biological father of Karen Eliahu (age 21) and Joseph Eliahu (age 19) who are American citizens residing in California.  Both children are handicapped and continue to depend on Plaintiff Eliahu for their needs.

21.     Plaintiff Silberman is a citizen of the USA and Israel whose service address is 6A Yizchak Ave at Haifa, ISRAEL  34482.  He is the biological father of a minor aged 9.

22.     Defendant, Jewish Agency for Israel, inc. (JAFI) is located at 633 3rd Ave, 21st Floor New York NY 10017 (Tel.1-212-318-6121).  Defendant JAFI was established in this District in 1929 and the Israeli government granted them governmental powers under the Jewish Agency Law of 1952. Defendant JAFI continues to be obligated to all the laws of the United States under the personal jurisdiction of this District.  For decades Defendant JAFI has served as the main umbrella organization for the racketeering described herein.

23.     Defendant New Israel Fund ("NIF") is a U.S. based 501(c)(3) organization located in New York with an address of 330 Seventh Avenue, 11th Floor, New York, NY 10001-5010.  Defendant NIF raises millions of dollars in this District tax-exempt and uses a portion of those funds to pay off Israelis to advance their racketeering.  Their agents in Israel specifically recruited ex-wives of Plaintiffs Newman and Weisskopf to pursue bogus "debts" in separate extortion schemes.

24.     Defendant, Jewish Federations of North America, inc. (JFNA) is located at 25 Broadway; #1700; NY, NY 10004-1010 (Tel. 1-212-284-6500).  Defendant JFNA oversees fundraising and distribution of $3 billion annually from Jewish communities all over North America in partnership with Defendant JAFI and the Israeli government[1] from this District.  In reality they oversee policies

1  http://p2g.jewishagency.org/partnership-regions

alongside Defendant JAFI to protect their longtime agendas that include extortion – including all Plaintiffs.

25.    Defendant Na'amat, inc. (Na'amat) is a non-profit corporation at 505 Eighth Ave; Suite 2302 at New York, NY 10018 (Tel. 1-212-563-5222).  Defendant Na'amat promotes itself as, "the largest and leading women's movement in Israel."  They portray women as weak victims who need "legal aid" and "domestic violence support" against men.  Instead of helping women and children, Defendant Na'amat exploits women and children for extortion against men and their relatives – even when the men's relatives are women and children (and elderly and handicapped and other protected-class minorities) as specifically happened to Plaintiffs Zamansky and Eliahu.

26.    Defendant WIZO – Women's International Zionist Organization, inc (WIZO) is a not-for-profit organization located at 950 3rd Ave at New York, NY  10022 (Tel. 1-212-751-6461).  Defendant WIZO claims to operate, "over 800 social welfare projects including child care centers, schools, shelters for battered women, homes for girls . . . ."  These centers have been the subject of shockingly egregious scandals against women and children.  Instead of helping women and children, Defendant WIZO exploits women and children for extortion against men and their relatives – even when the men's relatives are women and children (and elderly and handicapped and other protected-class minorities) as specifically happened to Plaintiff Eliahu.

27.    Defendant, P.E.F. Israel Endowment Fund, inc. (PEF), is a not-for-profit corporation at 317 Madison Ave. Suite 607 at New York, NY  10017.  (Tel. 1-212-599-1260).  Defendant PEF  is subject to Internal Revenue Service (IRS) regulations under sections 501(c)(3), 509(a)(1) and 170(1)(A) of the Internal Revenue Code.  Defendant PEF is responsible for funding numerous radical anti-father organizations who are bent of the destruction of the traditional family without funding a single organization that promotes fatherhood, healthy family relationships or assisting disabled single fathers and protected-class minorities who have been severely traumatized by Defendants' extortion.

28.     Defendant, Tzipi Livni resides at #8 Nisan Cohen St.; Tel Aviv, Israel.  Upon information and belief she also maintains a residence in Brooklyn, New York.  She was employed as the Israeli Minister of Justice until December 2014 with responsibility over the Administrator General and Official Receiver and the Debt Collections Office. During her tenure as minister she completed a $30 million contract with IBM headquartered in New York to implement a logistical system at the Debt Collections Office for their extortion racket described herein.  Meanwhile, she obstructed investigations into extreme extortion practices in the Debt Collections Office[2], including an investigation against co-Defendants related to this matter.

29.     Defendant, Shmuel Chamdani, whose service address is 37 Jeremiah St.; Building A; Jerusalem, ISRAEL 9134102 (Tel. 011-972-2-508-4126) is in charge of supervising policies and procedures at the Debt Collections Office.  As a retired judge, he gives the appearance credibility under color of law to racketeering within the Debt Collection Office by obstructing investigations into the Debt Collections Office when complaints relate to serious violations of human rights including fraud, extortion, false arrests and imprisonment, and wrongful death.

30.     Defendant, Tomer Moskowitz, whose service address is 37 Jeremiah St.; Building A; Jerusalem, ISRAEL 9134102 (Tel. 011-972-2-508-4126) is a retired judge and manager of the Debt Collections Office.  As a retired judge, he also creates and appearance of credibility under color of law to racketeering within the Debt Collections Office by rewarding registrars who violate basic human rights to secure increased budgets.  Tactics include *ex parte* pseudo orders and false arrests, as happened to Plaintiff, and wrongful death as happened to Plaintiff's grandmother located in the United States.  When Plaintiff requested a criminal investigation against Defendants Darmoni and Yalumi Defendant Moskowitz acted under color of law to cover up their crimes.

---

2   http://www.ynetnews.com/articles/0,7340,L-4515570,00.html

31.    Defendant, Na'ama Boltin, whose service address is Weitzman St. #1 at Tel Aviv, ISRAEL 64239 - is a registrar at the Debt Collections Office.  She acts under color of law as a pseudo judge complete with a pseudo courtroom to strong-arm divorced fathers to pay illegal debts.  In the case of Plaintiff Eliahu, she turned an award from a California court into an Israeli "debt".  Her tactics include ignoring court orders from real judges, *ex parte* pseudo orders and strong-arming extended family including elderly, handicapped, and protected-class racial minorities, as happened to Plaintiff Eliahu.

32.    Defendant, Miriam Darmony, whose service address is 37 Jeremiah St.; Building A; Jerusalem, ISRAEL 9134102 is a registrar at the Debt Collections Office.  She acts under color of law as a pseudo judge complete with a pseudo courtroom to strong-arm destitute fathers to pay illegal debts even when they have already been paid or even when the divorced father has already declared bankruptcy and even when the family court orders her to cease her strong-arm tactics.  Her tactics include ignoring court orders from real judges, *ex parte* pseudo orders and false arrests, as happened to Plaintiff, and false imprisonment up to half a man's life - and wrongful death as happened to Plaintiff's grandmother located in the United States.

33.    Defendant, Avigail Yalumi, whose service address is 12 Beit Hadfus St.; Jerusalem, ISRAEL 9134102 is a registrar at the Family Court in Jerusalem.  She acts under color of law as a pseudo judge to cover up crimes committed by Defendant Darmoni by obstructing appeals to the family court.  These two defendants coordinate to strong-arm destitute fathers to pay illegal debts even when they have already been paid or even when the divorced father has already declared bankruptcy and even when the family court orders them to cease their strong-arm activities.  Her tactics include ignoring court orders from real judges, *ex parte* pseudo orders and false arrests, as happened to Plaintiff, and false imprisonment up to half a man's life - and wrongful death as happened to Plaintiff's grandmother located in the United States.

34.     Defendant, Einat Gilead-Meshulum, whose service address is HaRofe 15a at Binyamina, ISRAEL (Tel. 011-972-54-211-8990) is a registrar at the Debt Collections Office.  She acts under color of law as a pseudo judge complete with a pseudo courtroom to strong-arm destitute fathers to pay illegal debts even when they have already been paid or even when the divorced father has already declared bankruptcy.  In the case of Plaintiff Zamansky, she repeatedly kept the debt open even after it was paid off while adding exorbitant made-up fees.  Her tactics include *ex parte* pseudo orders and strong-arming extended family including the elderly protected-class minorities, as happened to Plaintiff Zamansky.

35.     Defendant, Clanit Bergman, whose service address is Derech Hasharon 12; Sharona Center; Kfar Saba, ISRAEL - is a registrar at the Debt Collections Office.  She acts under color of law as a pseudo judge complete with a pseudo courtroom to strong-arm destitute fathers to pay illegal debts even when they have already been paid or even when the divorced father has already declared bankruptcy.  Her tactics include ignoring court orders from real judges, *ex parte* pseudo orders and false arrests, as happened to Plaintiff Silberman, and false imprisonment up to half a man's life.  She acts with reckless disregard for devastation she causes to families of victims including a pregnant wife and handicapped children in Plaintiff Newman's case and an elderly Holocaust survivor in Plaintiff Silberman's case.  In both Plaintiffs' cases, she targeted protected-class minorities who lacked sufficient resources to resist her extortion tactics.

36.     Defendant, John Hagee, is a pastor who broadcasts his television program from San Antonio, TX located at: 239 N Loop 1604 W, San Antonio, TX 78232.  (Tel. 1-210-494-3900).  Defendant Hagee founded John Hagee Ministries and Cornerstone Church in 1994.  The profile on Defendant Hagee's fundraising website boasts to be, "the largest pro-Israel organization in the United States".  Defendant Hagee collects donations from Evangelical viewers in the United States, and sends the funds to subsidiaries of Defendants JAFI, JFNA, and WIZO that portray Jewish fathers as 'violent'.  While

Defendant Hagee's donors believe that traditional family values are essential, he sends their donated money to organizations that advocates widely for the disengagement of children from their fathers. This false propaganda exposes fathers in Israel to be hunted down like animals in the Defendants' extortion racket – including the Plaintiffs.

37.     Defendant International Fellowship of Christians & Jews (IFCJ) has a service address of: 30 North LaSalle Street, Suite 4300, Chicago, IL 60602-3356 (Tel. 1-800-486-8844). IFCJ was founded as an outreach to evangelical Christians. While donors to Defendant IFCJ believe in the strength of traditional family values, Defendant IFCJ sends money to organizations that are devoted to the break-up of Jewish families, annihilation of men in divorce, and disengagement of fathers from children. For example, IFCJ supports Bat Melech as does Defendant PEF. Defendant IFCJ broadcasts a fundraising video all over North America which defames Jewish fathers in Israel as violent wife-beaters who threaten the lives of their wives and children[3].

38.     Defendant, Jerusalem Institute for Justice (JIJ) has a service address of 4963 Sesame Street at Cincinnati, OH  45244 (Tel. 1-303-502-6649). Defendant JIJ's mission statements have changed multiple times with the exception of promoting Calev Myers. Myers has a history of doing business with criminal elements and buying off political leaders. For example, one of the founding directors at the Jerusalem office is a member of the Israel Women's Network (IWN) who granted Defendant JIJ access to political leaders in exchange for defrauding evangelical Christians to donate to a radical agenda[4] to break up traditional families and devastate loving fathers as Defendant JIJ's Jerusalem office specifically did to Plaintiff Weisskopf.

39.     Defendant, Cary Summers, has a service address of 3343 Peachtree Rd, NE; East Tower; Suite 1000; Atlanta, GA 30326 (Tel. 1-770-813-0000). Defendant Summers is president of the Bible

---

3 http://youtu.be/47MvXmLPvCE

4  One of the IWN politicians publicly called on ending marriage and fatherhood  using false data:
    https://www.youtube.com/watch?v=qgzqtFJq89E

Museum, a subsidiary of Hobby Lobby. He also helped establish the Jerusalem Institute for Justice, a radical feminist organization that lobbies draconian policies which demonize Israeli men to the Israeli judiciary and legislature. He promotes himself as a conservative Evangelical to mislead well-meaning Christian donors, who support traditional family values, into financing the destruction of Israeli families via the Jerusalem Institute for Justice – and specifically one or more of the Plaintiffs.

40.      Plaintiffs bring this complaint on their own behalf, as victims of systematic torture and denial of human rights of men from protected-class minority groups, who are also subject to, abuse, harm and threats by or as a direct and proximate result of Defendants' actions as described herein.

## D. **HISTORICAL RACKETEERING BACKGROUND**

41.      Throughout the 1920's Jewish mafia families including the Ambergs, Bermans, Buchalters, Cohens, Eastmans, Feins, Feinsteins, Flegenheimers, Friedmans, Gordons, Holtzes, Kastels, Katzenbergs, Kovolicks, Landaus, Orgens, Rosencrantzes, Rothsteins, Schultzes, Sedways, Shapiros, Siegels, Tannenbaums, Toblinskys, Weinbergs, Weisses dominated the Jewish community in this District with their racketeering and extortion schemes.

42.      These Jewish mafia families spearheaded a worldwide network of Jewish mafia families too numerous to list here. Their reign of terror extended as far west as Hawaii and as far east as China – as far north as Russia and as far south as South Africa.

43.      Members of the above-referenced families and other international mafia families contributed to establishing Defendants WIZO, PEF, and Na'amat throughout the 1920's as shell enterprises to launder mafia funds gained through international racketeering and extortion.

44.      According to the <u>Resolutions of the 16th Zionist Congress</u> in 1929, Abraham Cohen and Morris Weinberg from the above-referenced families in this District were on the "Loan Commission" that helped finance the formation of Defendant JAFI. This was in addition to numerous others from other

districts that helped form Defendant JAFI as an umbrella organization for ongoing international racketeering and extortion schemes in the Jewish world described below.

45.     Over the years Defendants WIZO, PEF, Na'amat, JFNA, NIF, IFCJ, and Hagee consolidated under Defendant JAFI's umbrella for unified racketeering and extortion networking as described below.

46.     David Ben-Gurion headed Defendant JAFI from 1935 until 1948.  Defendant JAFI was so powerful that David Ben-Gurion automatically transferred from heading Defendant JAFI to head the provisional Israeli government without a democratic vote.  His tenure as head of Defendant JAFI was characterized by arms smuggling and deadly violent suppression of dissenting Jewish groups.  Thus, the Defendants' corruption, racketeering, and extortion polluted the fledgling Israeli democracy from the beginning.

47.     Ben-Gurion never honored U.N. Resolution 181 nor his own promise in the Declaration of Independence to establish a written democratic constitution that governs the laws in any accountable democracy.

48.     Instead he made sure to pass the Jewish Agency (Status) Law in 1952[5] granting Defendant JAFI governmental powers though it was and continues to be a private NGO in this District.  According to Paragraph #11 of this law, the State of Israel authorizes Defendant JAFI to be party in any legal proceedings on its behalf.

49.     It is important to note that without a written constitution as a foundation for all laws in a democracy; there are no enforceable laws in Israel except to serve the Defendants' interests under the Jewish Agency (Status) Law.

50.     Arguably the most infamous scandal in Israeli history was the systematic kidnapping of approximately 1,000 immigrant Yemenite babies by nurses and social workers acting under the

---

[5] http://knesset.gov.il/review/data/eng/law/kns2_wzo_eng.pdf

Defendants' authority in the early 1950's[6].  The parents of these babies were told that the babies died, however the bodies either vanished or were buried without permission.  When parents attempted to exhume the bodies in cases where their babies were supposedly buried, they found empty graves.  The only reasonable explanation for this is by the Yemenite community that claims their children were kidnapped and sold on the black market for adoption.  Despite repeated demands over the past 60 years for a legitimate investigation into these serious crimes, the Knesset only set up a sham committee to quash any real investigation.  This incident laid the foundation for social workers acting under the Defendants' authority to target immigrant families to this day – including the Plaintiffs.

51.     Another shockingly egregious incident was the "Ringworm Affair" whereby nurses and social workers acting under the Defendants' authority conducted forcible medical experiments on over 20,000 immigrant children throughout the 1950's.  These children were forcibly shaved and given lethal doses of radiation using defunct X-Ray machines bought from the United States to supposedly "cure ringworm".  (The American suppliers never claimed any X-Ray machines had any affect on ringworm.)  These bogus and deadly experiments were done against the will of the parents and children.  According to Professor Michael Berkowitz of the University College London, many of the children died from radiation poisoning[7].  Though such criminal experimentation on Jewish children was reminiscent of Dr. Mengle's "medical experiments" in Auschwitz – not a single person has ever been held accountable.  The Israeli legislature and judiciary instead granted "immunity" to the Defendants' agents who carried out the forced "medical experiments".  This set a very dangerous precedent that immigrant lives do not matter to the Defendants – including the lives of the Plaintiffs and their relatives.

52.     The Debt Collections Office was established in 1967 as a national "collection agency" that in reality has been an extortion racket in over 2.5 million files[8].  That represents over 25% of the Israeli population.  Defendant Livni oversaw the Debt Collections Office during her tenure as Minister of

---

6   http://www.haaretz.com/opinion/.premium-1.734537
7   http://web.international.ucla.edu/institute/event/9561
8   http://www.ynetnews.com/articles/0,7340,L-4515570,00.html

Justice and openly admitted to the extortion racket in 2014. Under her authority, Defendants Darmony, Yalumi, Boltin, Gilead-Meshulam, Bergman stepped up their extortion tactics within the Debt Collections Office as pseudo-judges presiding over fake kangaroo courts against victims, including the Plaintiffs, that were above the law. Defendants Moskowitz and Chamdani are former judges who give shelter to the racketeering under color of law. Their strong-arm tactics include warrant-less searches and seizures of homes and property, stop-orders from leaving Israel even in life-or-death emergencies, obtaining unauthorized personal documents from the United States, false arrests, false imprisonment even when doing so medically harms a civilian, invading privacy, demanding arbitrary and excessive "debts" of extended family, demanding made-up "fees and interest", violating court orders – both American and Israeli, forcing victims to borrow on the black market with kick-backs to the Debt Collections Office. These extortion tactics all violate citizen rights, including the Plaintiffs, under the Israeli <u>Basic Law: Human Dignity & Liberty</u>[9], the American <u>Bill of Rights</u>, the <u>14th Amendment to the U.S. Constitution</u>, the <u>Universal Declaration of Human Rights</u>, and numerous other laws universally accepted in any civilized nation.

53.     Defendant IFCJ was formed in 1983 as the Defendants' outreach to evangelical Christians. They have been abusing their tax-exempt status with the IRS to commit a massive fraud on evangelical donors all over North America. For example, they televise a fundraising video that falsely portrays Jewish men as murderous wife-beaters who endanger their children's lives[10]. This fundraising video clearly shows David Sultan's wife and children in violation of American, Canadian, and Israeli laws (See Case #1:12-CV-6844, Declaration of Sultan, Paragraphs 10-13) in their extortion racket targeting him specifically. Despite having been confronted on such fraud in 2012, Defendant IFCJ continues demonizing Jewish men to evangelical donors while participating in ongoing racketeering against immigrant divorced fathers – including the Plaintiffs.

---

9   https://www.knesset.gov.il/laws/special/eng/basic3_eng.htm
10  https://www.youtube.com/edit?o=U&video_id=47MvXmLPvCE

54.      Defendants JAFI, JFNA, IFCJ, WIZO, and/or their affiliates recruited Defendant Hagee to join their racketeering network. He formally incorporated his non-profit in 1994 after informal connection with the co-Defendants for at least 10 years. Since then he has defrauded well-meaning evangelicals out of millions thinking they have been "blessing Israel" when in fact their donations have funded extreme racketeering as described below.

55.      Throughout the 2000's Defendants JAFI, JFNA, PEF, WIZO, NIF, Na'amat, IFCJ, Hagee ran and/or supported medical clinics in Ethiopia and Israel that forcibly sterilized thousands of Ethiopian women[11]. The result is a 50% drop in the birth rate among Ethiopian immigrants over the past 10 years. Upon information and belief, the real purpose of this scandal was to conduct lucrative long-term experiments on unsuspecting immigrants for pharmaceutical companies. To date nobody has been held accountable and the Knesset "investigation" has been nothing more than lip service covering up for the Defendants as has typically happened in numerous high-profile scandals for decades. The Defendants have carte blanche to run involuntary drug experiments on immigrants – including the Plaintiffs and their children.

56.      In 2005 at least one director from Defendant IFCJ and Defendant Hagee recruited the Myers family and Defendant Summers to join the racketeering network. In 2006 Plaintiff Weisskopf retained Calev Myers as legal counsel for the Love for Israel Relief Fund (LIRF) without knowing about the racketeering background. Though Plaintiff Weisskopf's intent was to advocate for orphans and at-risk children, Myers intended to set up multiple shell enterprises for the racketeering network. For example, Myers received a $100,000 "donation" from Arcadi Gaydamak[12]. Meanwhile Myers was entangled with a drug cartel in South America and, as a result, had to pay off a $30,000 debt for Matthew Wada who was convicted of fraud in this District in 2014[13]. Myers imposed former Knesset

---

11 https://www.theguardian.com/world/2013/feb/28/ethiopian-women-given-contraceptives-israel

12  http://www.forbes.com/lists/2006/81/biz_06israel_Arkady-Gaydamak_C8TS.html

13  http://www.nydailynews.com/new-york/nyc-crime/duo-duped-20-manhattan-apartment-seekers-60-000-article-

Member Yair Peretz, who was also convicted of fraud, upon Love for Israel for several months. When Peretz proposed laundering $2 million from the mafia through a trust account under Myers' control and into LIRF, Plaintiff Weisskopf demanded he disentangle from Myers' corrupt sources. After Plaintiff Weisskopf and Myers parted company the Myers family set up a few shell enterprises, including Defendant JIJ in 2011. Defendant Summers exploits his influence and position to defraud well-meaning Christians to donate to agendas by Defendant JIJ that are contrary to evangelical beliefs.

## E. GENERAL ALLEGATIONS

57.    Plaintiffs bring this action on their own behalf as representatives of over 80,000 victims who suffer strong-arm extortion tactics by the Defendants to collect illegal debts under color of law.

58.    The Defendants keep files open on illegal and paid debts after knowing they should be closed in order to milk an artificially higher budgets and generate kick-backs from loans taken on the streets to avoid false imprisonment. Even court rulings from real judges do not deter the Defendants from their racketeering scheme.

59.    During Defendant Livni's tenure as the justice minister she admitted about the Debt Collections Office under her authority was an extortion racket[14]. In 2014 she stated that, "civil imprisonment for non-payment of debt is a serious blow to human rights. Imprisonment as a collection method is not legitimate as it applies undue pressure in alternative court mediation. Therefore, oftentimes the threat of imprisonment creates tremendous pressure on the debtor and his family, and may result in the debtor being forced to borrow even more money (including in the black market), in order to avoid imprisonment".

60.    After this admission, she singled out thousands of impoverished divorced fathers, including the Plaintiffs, to deny basic human rights to extort illegal debts. Instead of changing policies to protect human rights of divorced fathers, she abused the power of her office by broadcasting television

---

L.1941579

14  http://www.ynetnews.com/articles/0,7340,L-4515570,00.html

commercials that called on women "to war" against men in the Debt Collections Office and portrayed housewives in military uniforms[15]. Such draconian policies led to: (A) devestation upon Plaintiff Newman's pregnant wife and handicapped children; (B) trauma upon Plaintiff Zamansky's elderly father; (C) the wrongful death of Plaintiff Weisskopf's grandmother – a native of New York City with no connection to Israel; (D) mental break down of Plaintiff Eliahu's mother and sister and homelessness of his handicapped children alongside him; (E) Plaintiff Silberman's mother, a Holocaust survivor, suffering flashbacks from the midnight raid and false arrest against him.

61.     There are questions of law and fact common to the victims.  These questions include, among others, (1) whether the Defendants did or conspired to violate the Plaintiffs' right to an impartial tribunal guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.  (2) whether the Defendants devised and/or engaged in a scheme or artifice to defraud American citizens, including the Plaintiffs, and to deprive those citizens – and especially the Plaintiffs – of the intangible right of honest services and engaged in other racketeering activities.  (3) Whether the Defendants' actions caused injury to Plaintiffs' bodies, minds, and property interests.

62.     The Plaintiffs' claims are typical of the represented victims.  Like other victims, Plaintiffs maintain that the Defendants did or conspired to violate their rights to an impartial tribunal, to counsel, and caused them to suffer financial loss or other injuries to their bodies, minds, and property interests through a pattern of racketeering.

F.  **FINANCIAL ALLEGATIONS**

63.     Defendants JAFI, JFNA, PEF, NIF, WIZO, Na'amat, IFCJ, JIJ, and Summers set up shell enterprises in North America to channel private donations and other funds to Israel where it gets comingled with funds to carry out "social projects" with enterprises within the Ministry of Justice and Welfare including "Partner Together", "City Without Violence", and "Human Trafficking".  Upon information and belief, these projects are actually instruments to demonize Israeli men and facilitate

15  https://www.youtube.com/watch?v=9qLmTOKxzMg

false claims against them, including illegal debts, for extortion as described herein.

64.     Defendants JAFI, JFNA, PEF, NIF, WIZO, Na'amat, IFCJ, JIJ maintain offices in Jerusalem where they closely monitor activities in the Knesset and municipalities nationwide to ensure their interests are protected at each level of government.  They actively participate in creating policies and procedures that ensure the nationwide rackets operate exactly as they demand.

## G. FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF NEWMAN[16]

65.     Plaintiff Newman the biological father of Ori Newman (age 19); and Minors, EL (age 17), N (age 15), G (age 11), I and ET (infant twins aged 7 months).

66.     Ori Newman is currently a soldier serving in the military and lives full time on a military base at the expense of the military.

67.     Minors N & G live part-time with their mother and part-time with Plaintiff Newman.

68.     Minors EL, I, and ET are in Plaintiff Newman's full-time custody.

69.     Minors I and ET were born prematurely in 2016 and Minor ET needs frequent hospitalizations in the pediatric intensive care unit (ICU) as a result.

70.     Minor EL is a handicapped child with a lot of medical and educational needs.  The mother completely abandoned all obligations and has not been in Minor EL's life at all for the past four years nor contributed a single penny to any of EL's financial needs.

71.     Prior to April 2015, Plaintiff Newman's ex-wife joined "Bat Kol", an unincorporated subsidiary of Defendant NIF for Orthodox Jewish lesbians.  Their agenda has been to destroy him financially and emotionally as the biological father of his children.

72.     In April 2015 his ex-wife recruited Clanit Bergman in the Debt Collections Office to collect an unlawful "child support" debt for Minors N & G despite the heavy financial burden she had neglected with Minor EL's special needs.  Upon information and belief, Clanit Bergman is also in the network with Plaintiff Newman's ex-wife.

16 Factual allegations in this section are from the Declaration of Dotan Newman

73.     Clanit Bergman acted under color of law to deprive him of his human rights and caused him to suffer financial loss, severe emotional distress, and other injuries.

74.     Clanit Bergman arbitrarily added 36,000 shekels ($9,000) to a bogus "debt" against Plaintiff Newman.

75.     Thereafter Clanit Bergman issued: (A) A stop-order from leaving the country against him, (B) An order freezing all his bank accounts, (C) An order freezing all credit cards, (D) Garnishment against his wages, (E) Excessive interest far beyond international norms, (F) Revoked his driver's license.  All of this was without any warning or due process.

76.     He immediately showed proof that a large amount of the claim was an illegal debt and requested access to his bank account to pay the remainder of the debt and pay for his child's special education because his ex-wife was not paying anything at all.

77.     Bergman ignored Plaintiff Newman's pleas and paralyzed him financially in violation of a court order by a real judge and in violation of his basic civil and human rights.  What makes this especially despicable is she knew that she was devastating three minors in his household, including a handicapped child, as well as his current wife who was pregnant with twins - in her crusade to extort a fortune out of him.  The collateral damage she caused to a woman and children did not restrict her zeal for extortion.

78.     In June 2015 Plaintiff Newman again requested that at least the monthly child support payments be drawn from his bank account to avoid falling behind on monthly child support for Minors N & G – which was supposed to be Bergman's excuse for freezing all his assets under color of law in the first place.

79.     Bergman rejected his request intentionally causing him an artificially exorbitant child support debt with illegal "interest and fees" far beyond any reasonable demand.  Since she froze all of his assets in Israel, she only allowed him to pay for protection against false arrests by either borrowing from the black market or borrowing money American money and adding "foreign fees" and higher

interest rates.

80.     In reality she was strong-arming him to borrow money from the black market and/or the United States in order to pay the debt instead of supporting his current wife and children.  Even worse is she knew that she was driving his children into poverty as pawns against him – including handicapped children.

81.     After Plaintiff Newman's infants were born prematurely in January 2016, he and his current wife had to practically live at the hospital while also caring for children at home, including their handicapped children.

82.     He again begged Bergman for some level of mercy for **emergency treatment** for his children. His pleas again fell on deaf ears.  Bergman's heartlessness in her extortion tactics far exceeded his legal rights in any civilized country.

83.     What is more, she took the crusade upon herself to extort far more money from him than the court order allowed or even than what his ex-wife requested in the first place.  It was her own agenda to strong-arm him out of a small fortune that he could not possibly afford with reckless disregard for the devastation she was causing his vulnerable wife and children.

84.     She threatened him with additional "special fees" if he were to make further requests for relief from the financial devastation she unleashed on him.

85.     Bergman has automatically taken everything away from Plaintiff Newman including his money, his driver's license, his credit card, his ability to join a corporation or non-profit and even his entire salary.  This violation of his human rights causes Plaintiff Newman egregious emotional distress that no reasonable person should be expected to endure.

86.     The threat of arrest and imprisonment hangs over his household.  The trauma his children experience every time they think a policeman is going to take their father away from them under color of law in an extortion racket is indescribable emotional distress on his entire family.

87.     To avoid borrowing money on the black market, Clanit Bergman forced Plaintiff Newman to

"buy" protection from false arrests using American monetary payment instruments that incurred substantially higher "foreign fees" and interest.

88.     Plaintiff Newman requested in writing from Defendants Chamdani, and Moskowitz to investigate the devastating misconduct of Defendant Bergman.  They employed strategies implemented by Tzipi Livni to obstruct any investigation and neglected to intervene in any way against the above-described racketeering to protect Plaintiff Newman's wife & children or him and their basic human rights.

## H. FACTS SPECIFIC TO PLAINTIFF ZAMANSKY

89.     Plaintiff Zamansky is the biological father of Minor N (age 2).

90.     He has security clearance to work in high level security and is licensed as a law enforcement officer.

91.     Plaintiff Zamansky's plight started in 2013 from day of birth of the child: the mother of Minor N dangled the infant out of their apartment window and threatened to murder the baby by dropping Minor N to the street below to prevent him from going to work, threatened to spray acid and other dangerous chemicals in Minor N's face and so on.

92.     He filed a complaint with the police who opened a criminal investigation against the mother. They recommended prosecuting the mother and requested assistance from a child welfare social worker to determine whether to place Minor N into his custody as an infant.

93.     Defendant Na'amat took Minor N into their "daycare" without Plaintiff Zamansky's permission though he still has full parental rights. When he went to Defendant Na'amat's "daycare" to see his child, he was refused by administration.

94.     He was already seeking relief through official legal channels and not through Defendant Na'amat as a private American organization with a branch in Israel.

95.     Upon information and belief, Defendant Na'amat managed to quash expert evaluations, police

reports (including firsthand police testimony), and eye witness testimonies that all suggested placing Minor N into Plaintiff Zamansky's exclusive custody as the only psychologically stable parent.

96.     For example, he was coerced into paying 14,000 shekels ($3,500) for a parental fitness evaluation performed on both parents in order to see his child. Even worse was visitation rights between Minor N and him were severed and Na'amat managed to "contract" themselves to "provide daycare" for his child from morning until night to minimize the dangerous home environment with the mother. Their "contract rate" with the judiciary was far beyond the cost of seeking the most natural and least restrictive environment for Minor N within the community and specifically with Plaintiff Zamansky.

97.     Plaintiff Zamansky is a military veteran and maintains high-level security clearance as he continues protecting civilians and leaders alike. Yet Defendant Na'amat obstructs him from enjoying an ice cream with his child.

98.     In August 2015 Na'amat pushed the mother of Minor N to open a file against Plaintiff Zamansky with the Debt Collections Office in Petach Tikvah for an unlawful "child support" debt though he was current on all of his actual child support payments.

99.     The original registrar attempted to resolve the dispute as fairly as possible. Upon information and belief, Na'amat manipulated a switch in registrars to one of their own agents, Defendant Gilead-Meshulam.

100.    When Defendant Gilead-Meshulam took over the file in November 2015; she has made Plaintiff Zamansky's life a living nightmare ever since.

101.    She acted under color of law to deprive him of his basic rights and caused him to suffer financial loss and other injuries.

102.    Plaintiff Zamansky was paying child support with a credit card, and the balance of his account in the Debt Collections Office was zero. When Defendant Gilead-Meshulum saw that he was paying every month with a credit card, she has decided to freeze his credit card.

103.    This action not only obstructed him from buying essential food for his family, but also obstructed his ability to stay current on child support.

104.    Defendant Gilead-Meshulam automatically issued: (A) An order freezing all bank accounts, (B) An order freezing all credit cards, (C) Garnishment on all wages, (D) Excessive interest far beyond international norms. All of this was without any warning or due process.

105.    Plaintiff Zamansky showed proof that the claim was an illegal debt and requested Defendant Gilead-Meshulam close the collection file.

106.    Defendant Gilead-Meshulam ignored his request and paralyzed him financially in violation of his basic civil and human rights.

107.    Furthermore, he appealed to her as the sole provider and care-giver of his elderly father. She only intensified her strong-arm tactics against him; which also put his elderly father under even greater duress.

108.    Since she froze all of his financial assets, he cannot pay her protection money without either borrowing money on the black market or seeking payment instruments in the United States at higher fees and interest to satisfy her demands. He does not want to be indebted to Israeli criminals and therefore could only try to satisfy Defendant Gilead-Meshulam's demands through American channels.

109.    Defendant Gilead-Meshulam knew or should have known that she was forcing him into a situation where his only option would be to either borrow money on the black market or use American payment instruments to pay the debt. Even worse is Defendant Gilead-Meshulam knew that she was driving his child and elderly parent into poverty alongside him.

110.    Plaintiff Zamansky cleaned out every penny from his bank account and his father's bank account in order to pay off the bogus debt that Defendant Na'amat's agent, Defendant Gilead-Meshulam, imposed on him. After the debt was paid off she artificially kept the file open with "interest and fees". In August 2016 she kept an artificial open balance of 46 shekels ($11). Each time he pays off his "debt", she makes up a new balance to artificially keep the file open.

111.    The financial and emotional devastation Plaintiff Zamansky has endured in a short time is

beyond words. Today, he tries to survive and rehabilitate his child who suffered horrendous

psychological trauma at such a tender age as a result of the shockingly egregious racketeering

described herein.

## H.  **FACTS SPECIFIC TO PLAINTIFF WEISSKOPF**

112.    Plaintiff Weisskopf the biological father of Minor L (age 12), Minor N (age 10), and Minor M

(age 8).

113.    In July 2012 Shatil, self described as the operative arm of Defendant NIF, recruited his ex-wife

as an activist for them in the Knesset (the Israeli parliament).  Upon information and belief, Shatil paid

off his ex-wife 50,000 shekels (approximately $12,000) from $2 million in tax-deductible donations the

Defendant NIF raised at a banquet in Manhattan, NY.

114.    Simultaneously, Shatil directed his ex-wife to open a file against Plaintiff Weisskopf with

Defendant Darmony in the Debt Collections Office for an unlawful "child support" debt of 16,000

shekels (approximately $4,000).  This is despite the fact that Plaintiff Weisskopf had already prepaid

child support at least 15 years in advance and deposited over 19,000 shekels (approximately $5,000) in

escrow at the family court.

115.    Upon information and belief, Defendant Darmony is also active within the Defendants'

racketeering network.  She acted under color of law to deprive Plaintiff Weisskopf of his human rights

and cause him to suffer financial loss and other injuries.

116.    From March 2013 to July 2013, Defendant Darmony issued: (A) A stop-order from leaving the

country against Plaintiff Weisskopf, (B) An order freezing all bank accounts, (C) An order freezing all

credit cards, (D) Garnishment against all income, (E) Excessive interest far beyond international norms,

(F) A warrant for his arrest.  All of this was without any warning or due process.

117.    In July 2013, Plaintiff Weisskopf needed surgery on an infected cyst in his sinus that was one

millimeter from his optic nerve and brain stem. He begged Defendant Darmony to cancel the arrest warrant so he could have this urgent surgery and recover properly.

118.    In violation of his basic human rights, Defendant Darmony ignored the plea, exploited his distress, and hunted him down during his hospitalization and recovery. They arrested him in August 2013 when he was still physically suffering and could not stand for more than a few minutes. He was forced to walk nearly a mile and stand 45 minutes for the hearing their bogus "debt" though the Debt Collections Office knew about his medical problem.

119.    An attorney rescued Plaintiff Weisskopf *pro bono* at that hearing without notice. He showed proof to Defendant Yahalomi that the debt was illegal and that the family court was even holding over 19,000 shekels ($5,000) of his money in escrow to guarantee future child support payments. The amount in question was only 16,000 shekels ($4,000). Despite all this, Defendant Yahalomi demanded he pay an additional 4,000 shekels ($1,000) on the spot or go to her jail without adequate medical treatment. It did not matter to Defendant Yahalomi that Plaintiff Weisskopf's medical condition would certainly deteriorate in her "civil" jail. Since he had no money, the police officers took him to borrow $1,000 on the black market. They explained that the black market allowed the Debt Collections Office to earn side money for "collections" off the record.

120.    Between August 2013 and December 2013, Plaintiff Weisskopf discovered that the Israeli National Insurance also opened a file against him in the Debt Collections Office for child support that he had already paid. It means the Debt Collections Office knew Plaintiff Weisskopf was being triple-billed for child support while hunting him down like an animal without human rights.

121.    There was a hearing in December 2013 in which Plaintiff Weisskopf's ex-wife did not appear. During that hearing, her lawyer wanted to bring in his elderly mother from the USA in as a witness. Plaintiff Weisskopf objected because: (A) It violates the family court ruling dated 12/05/2009 not to harass his elderly parents. (B) His mother is elderly with a weak heart, (C) There was an expert's letter shown to Defendant Darmony explaining that Plaintiff Weisskopf's mother is mentally sick, (D) It is

inhumane to require such a woman to stay awake all night for testimony at 4:00am her time, and; (E) Such harassment would traumatize both his parents and his grandmother and can cause any of them to be hospitalized or even death.

122.   Defendant Darmony continued the hearing to February 2014, giving over two months to properly file motions, affidavits, decisions, etc. whether to force Plaintiff Weisskopf's elderly mother to testify against the expert's opinion and against a real court's ruling.

123.   Instead of handling Plaintiff Weisskopf's serious claims about his mother's health, court documents show that Defendant Darmony aided and abetted his ex-wife to steal his identity from the United States and use his stolen identity from the USA against him in Israel.  She ignored his request to quash the illegal documents stolen from the United States and kept them in the file as "evidence" against him to fabricate a bogus impression that he held large sums of money in the United States that she could extort.

124.   At the sham hearing in February 2014 Defendant Darmony allowed Plaintiff Weisskopf's ex-wife to spontaneously call and interrogate his mother  on the ex-wife's personal mobile phone in the middle of the hearing and without following a single procedure prescribed by law.  Defendant Darmony claimed that this was done "for reasons of efficiency" despite having two months to properly set up testimony via video conference according to the law.  She did this against his written and verbal objections which detailed the life threatening dangers of such an illegal action.  Her "efficiency" supplanted justice, fairness, procedural rules, affidavits, credible evidence, endangering the elderly – only to throw out the testimony after traumatizing his elderly relatives.

125.   Defendant Darmony seriously violated procedures that govern her against elderly American citizens who reside exclusively in the United States under the auspice, "that the testimony of the parents is relevant and of great importance."  However, she knew that the ex-wife made the call after coercing and blackmailing Plaintiff Weisskopf's terrorized elderly parents at 4:00am.

126.   After the traumatic hearing in February 2014, Plaintiff Weisskopf's mother (then aged 72) and

grandmother (then aged 93) were both hospitalized. His mother underwent treatment for several months and his grandmother passed away in April 2014.

127.    While Plaintiff Weisskopf's grandmother was on her deathbed, he begged Defendant Darmony to let him leave Israel on humanitarian grounds to visit his grandmother before she died and to follow Jewish custom of "sitting shiva" for her. Defendant Darmony instead made a mockery of his dire situation (to which she had contributed) by demanding 30,000 shekels (approximately $7,500) protection money in order to go to his dying grandmother.

128.    When Plaintiff Weisskopf filed an appeal in September 2014, it fell into the hands of Defendant Yahalomi again. The moment Defendant Yahalomi saw that her own decision was part of the appeal; she had a legal, ethical, and moral obligation to recuse herself as biased. However, she obstructed the appeal with a blatant conflict-of-interest. It is also worth mentioning that Defendants Yahalomi and Darmony are close personal friends.

129.    Plaintiff Weisskopf requested in writing from Defendants Livni, Chamdani, and Moskowitz to investigate the deadly misconduct of Defendants Yahalomi and Darmony. All three obstructed any investigation.

130.    The family court ruled that Defendants Yahalomi and Darmony were to return moneys Plaintiff Weisskpf deposited with them and cease and desist any new strong-arm tactics against him.

131.    They refused to return his money and instead illegally cleaned out his bank account and intentionally leaving a negative balance in his bank account. In November 2015 Defendant Darmony issued a new arrest warrant against Plaintiff Weisskopf *ex parte* without any due process whatsoever and in violation of a court order from a real judge. He is currently a homeless refugee as a result.

132.    During Plaintiff Weisskopf's time in hiding from false arrest Defendant Darmony increased his bogus debt from 16,000 shekels to 30,000 shekels to secure release of the escrow funds from court. After deducting 19,000 shekels from 30,000 shekels, she increased his "debt" to 40,000 shekels and then added another 250,000 shekels to ensure he could never pay off the "debt" and still keeps the

warrant for his arrest active.

133.    For the past year, Defendant Darmony has been filing "motions" to herself on the ex-wife's behalf to strip him of his basic rights under Israeli law, American law, and international laws in all civilized nations.

134.    She ignored the court order forbidding such actions before trial. This despite several requests to honor the court order and set a hearing date. After six months enduring life as a refugee, she issued an order on June 29, 2016 that she would honor the court order and cancel the arrest warrant only if Plaintiff Weisskopf were to buy protection from arrest amounting to 5,000 shekels ($1,200). This despite knowing he is indigent and have proof that the debt was paid in the first place. With documents containing Plaintiff Weisskopf's stolen American identity in her unauthorized possession, Defendant Darmony strong-arms him to use American payment instruments to buy her "protection" against false arrest and/or abusing his elderly relatives in the United States.

135.    In July 2016 Plaintiff Weisskopf again requested from Defendants Chamdani and Moskowitz to investigate Defendants Yahalomi's and Darmony's deadly racketeering against American citizens. They merely employed Defendant Livni's strategies to obstruct any investigation.

J.   **FACTS SPECIFIC TO PLAINTIFF ELIAHU**

136.    Plaintiff Eliahu is the biological father of Karen Eliahu (age 21) and Joseph Eliahu (age 19) who are American citizens residing in California. Both children are handicapped and continue to depend on him for their needs.

137.    Plaintiff Eliahu and his ex-wife settled permanently in California where they both have continuously lived since 1997.

138.    In 2003 they began divorce proceedings in the Superior Court of California for the County of Santa Clara where where jurisdiction belonged exclusively.

139.    In 2007, the California Superior Court handed down final rulings as follows: A) awarded

Plaintiff Eliahu full custody of both children; B) Ordered his ex-wife to pay approximately $1,300 per month in child support; C) Awarded him approximately $760,000 for his share in the marital assets.

140.   By 2008, his ex-wife fell behind in child support by approximately $25,000.

141.   Upon information and belief, his ex-wife turned to Defendants WIZO and Na'amat to circumvent her child support obligations under final court rulings in California. They steered her to Tamar Paul-Cohen in Israel under the guise of "providing legal aid" to turn the tables on Plaintiff Eliahu in an extortion scheme.

142.   In 2012 Na'amat's agents recruited Defendant Boltin, head of the Debt Collections Office, to act under color of law and turn Plaintiff Eliahu's $760,000 award in California Superior Court into a $380,000 debt in Israel.

143.   Since he had absolutely no assets in Israel nor resided in Israel, Defendant Boltin acted under color of law to hold Plaintiff Eliahu's elderly mother, sister, her husband, and even her children as hostages until he paid off the ransom demand.

144.   Defendant Boltin automatically issued against Plaintiff Eliahu's extended family alongside him: (A) An order freezing all bank accounts, (B) An order freezing all credit cards, (C) Garnishment on wages – including wages from his sister's children, (D) Excessive interest far beyond international norms, (E) Seized the business wholly owned by his sister and her husband. All of this was without any warning or due process.

145.   Meanwhile his entire extended family had to buy protection from arrest totaling $2,540 per month for two years.

146.   Plaintiff Eliahu showed proof that the claim was illegal and requested Defendant Boltin cease and desist her extortion tactics.

147.   Defendant Boltin ignored his request and instead began foreclosure proceedings on the houses of his elderly mother and his adult sister without even trying to hide that the real agenda was to extort $380,000 out of him plus "interest and fees".

148.    In March 2013 his ex-wife purchased her current primary residence in Mountainview, CA for $1.4 million.  It is important to emphasize that she has been a California resident continuously since 1997.

149.    In Israel, Defendant Boltin set an "eviction date" of December 6, 2013 when Plaintiff Eliahu's elderly mother would be forced onto the streets penniless alongside his sister and her family if he did not pay the Debt Collection Office well over $380,000.

150.    The trauma was so extreme that his 84 year-old mother's life was in danger and needed urgent medical attention as she slipped into delirium from the trauma.  Plaintiff Eliahu's sister emotionally broke down, which caused a great strain on her own marriage and family.  She continues to need psychiatric treatment to this day.

151.    His sister stated in one of her e-mails to him, "I do not sleep at night and cannot function at all.  Yesterday for the first time in history I forgot my laptop at home.  I make mistakes at work and I have no idea what we are up against in the Debt Collections Office.  I do not know when Mom will receive a letter in the mail saying that she must leave her home."

152.    Since Plaintiff Eliahu did not want his elderly mother to die nor see his sister's entire family be ruined; he was forced to sell his own home to pay off the Debt Collections Office.  This left Plaintiff Eliahu, a single parent in California, homeless with both of his children.

153.    He sent the money from California to Israel so Defendant Boltin could take her cut and send the rest back to his ex-wife in California.  However, they claimed the money did not arrive to the Debt Collections Office before the deadline on December 6, 2013.

154.    The evictions were delayed until April 2014 so long as he added "penalties" for failing to pay off the entire ransom by December 6, 2013.

155.    On April 2, 2014 the Debt Collections Office confirmed receipt in Israel of 1.75 million shekels (approximately $440,000) that Plaintiff Eliahu had sent.  However, Defendant Boltin refused to close

her "debt collection" against him. Instead, she added 20,000 shekels (approximately $5,000) in "attorney's fees" plus 47,000 shekels (approximately $12,000) in made-up "administrative fees".

156.   From April 2013 through August 2013 Plaintiff Eliahu had to borrow from his family in order to keep up with all of Defendant Boltin's arbitrary demands.

157.   Since Plaintiff Eliahu paid off every "fee" by September 2013, Defendant Boltin decided to revive the "debt collection" by recalculating the dollar-shekel exchange rate at 4.1 shekels to the dollar. Such an exchange rate has not been that high since 2006, one year before the California Superior Court handed down its rulings in Plaintiff Eliahu's favor. She effectively created an additional $57,142 out of thin air to add to the "debt".

158.   All tolled, Plaintiff Eliahu was extorted approximately $800,000 in less than two years on an initial demand of $380,000. This was his punishment for winning custody of his children in California and receiving his share of the marital assets.

159.   These funds went from California to Israel without any jurisdictional basis whatsoever. There the Debt Collections Office took their cut and sent the balance Plaintiff Eliahu's ex-wife who resides in California where the funding originated in the first place.

160.   To this day he has neither recovered financially nor emotionally from this ordeal while his ex-wife has approximately $2 million in assets at the expense of his ability to feed his children or keep his extended family safe from extortion.

161.   The message is clear – Defendants Boltin and Na'amat are part of a large international racketeering network with long arms to reach Plaintiff Eliahu's entire family and him anywhere in the world and they will not hesitate to put any of them in the grave literally to extort any amount of money they want – especially when he tries collecting on arrears in child support.

162.   To this day Plaintiff Eliahu suffers PTSD solely because of the extreme trauma he suffered from the racketeering scheme described above.

**J.  FACTS SPECIFIC TO PLAINTIFF SILBERMAN**

163.   Plaintiff Silberman is the biological father of a Minor (age 9).

164.   He has been divorced for almost 8 years.

165.   When Plaintiff Silberman got divorced; his ex-wife opened a file in the Debt Collections Office for child  support and he pays his child support to them ever since.

166.   After his divorce Plaintiff Silberman went back to the United States and sent the monthly payments to Israel using American payment instruments without missing a single payment.

167.   Almost 4 years ago he came to Israel on a visit and ever since then his life became hell and miserable.

168.   Plaintiff Silberman found  that in February 2013 Defendant Bergman issued a stop-order preventing him from leaving Israel unless he were to pay 200,000 shekels (approximately $50,000) for "advance payments" until his child turns 18.

169.   Though he has no criminal record at all, Defendant Bergman has been treating him like a prisoner under color of law for a "future debt" that does not exist in reality.  He is unable to protect himself because he does not have the money that she demands.

170.   For eight years he has done everything he can to satisfy Defendant Bergman's demands.  He even spent a small fortune on attorneys; however Defendant Bergman's agenda was to shut down every single defense he had.

171.   Since February 2013 Defendant Bergman issued: (A) A stop-order from leaving the country against him, (B) An order freezing all bank accounts, (C) An order freezing all credit cards, (D) Garnishment against all income, (E) Order against issuing him a passport, (F) Excessive interest far beyond international norms, (G) A warrant for his arrest.  All of this was without any warning or due process.

172.   Plaintiff Silberman became like a person without any rights. He felt like a prisoner without

handcuffs in Israel which made him depressed and miserable all the time.

173.   One night a policeman nearly kicked in his mother's door to arrest him in the middle of the night over bogus "interest" at the Debt Collections Office.  His mother is a 90 year-old Holocaust survivor who had a flash back to her days in Nazi Europe and nearly died on the spot.

174.   He arrested Plaintiff Silberman in front of her – causing her extreme trauma she had not experienced since the Holocaust.

175.   After a few hours at the police station, the police officer told him he would release Plaintiff Silberman to his elderly mother if she were to sign a "promissory note" that Plaintiff Silberman would pay off "interest" to the Debt Collections Office within 24 hours.

176.   That night he will never ever forget.  To this day he has nightmares: he had never been arrested before in his life.  It was horrific for him to see his mother in that condition.

177.   After that ordeal Plaintiff Silberman thought his life would return to normal but  unfortunately he was wrong.

178.   He found out that Clanit Bergman still had the stop-order in place preventing him from leaving Israel and going back to America where he lived for about 25 years.

179.   Clanit Bergman held his mother and him hostage and the only way out was to buy off everyone in Clanit Bergman's network.

180.   Since he did not want to see his mother suffer or die from extortion tactics, he had to borrow over $50,000 on the black market in August 2016 to buy his release from the stop-order preventing him from returning to his home in the United States after four terrifying years held prisoner in Israel.

181.   Plaintiff Silberman is now a refugee in the United States and hopes to find a way to pay off the debt he incurred on the black market to buy his release from Defendant Bergman's racketeering network.  However, he fears every day for his elderly mother's life as Defendant Bergman continues

exploiting her and his extended family to extort more money out of him.

## COUNT ONE
## RECKLESS DISREGARD
## FOR HUMAN RIGHTS
### (All Plaintiffs v. All Defendants)

137.    Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

138.    Defendants recklessly disregarded the Plaintiffs' rights to "most favored nations" treatment in Israeli tribunals as no less favorable that the treatment enjoyed by women in tribunals.

139.    Defendants knew, or should have known, that their encouragement or disregard and/or negligence regarding the atrocities against divorced men in Israel, would result in the harm, pain and suffering, as described above.

140.    Defendants knew, or should have known, that they violate the of rights of the American Plaintiffs insofar as they are entitled to treatment in Israel at a "most favored nations" basis equal to the treatment women in Israel.

141.    Defendants knew, or should have known, that their conduct against the Plaintiffs and others similarly situated was a violation of clearly established international Human Rights norms.

142.    Defendants knew, or should have known, that their conduct against the Plaintiffs and others similarly situated was a clearly-established violation of a private person's rights in any civilized nation.

143.    A reasonable person in any civilized nation would have known that fraud, racketeering, extortion, false arrest, false imprisonment, wrongful death and discrimination based on gender, religion or handicap are violations of clearly-established rights of a private citizen.

144.    Defendants knew, or should have known, that their disregard of the rights of Plaintiffs, and others similarly situated causes an increased annual suicide rate among divorced men that is 8 times higher than other men which is a 3-to-1 ratio over women.

145.   Defendants knew, or should have known, that their disregard of the rights of Plaintiffs, and others similarly situated, causes the impoverishment, bogus arrest warrants, and false arrests of thousands of men each year – including the Plaintiff.

146.   Defendants knew, or should have known, that their disregard of the rights of Plaintiffs, and others similarly situated causes the massive transfer of over $1 billion dollars in properties lawfully belonging to men, which are taken without due process and usurped by their various enterprises.

147.   Despite this knowledge, or despite the fact that they did not take reasonable steps to know what a reasonable person should know, Defendants intentionally failed to investigate or evaluate Plaintiffs' assertions of improper conduct, Plaintiffs' specific suffering and the impacts on others similarly situated.

148.   As a direct and proximate cause of the acts and omissions of Defendants foreseeable physical and emotional injuries were inflicted upon the Plaintiffs.

149.   As a result of the foregoing Plaintiffs have been damaged in an amount not less than $10,000,000.

**WHEREFORE**, Plaintiffs requests judgment in their favor and against all Defendants in an amount in excess of $75,000 to be determined by jury plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine.

## COUNT TWO
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs v. Israeli Defendants)

150.   Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

151.   Plaintiffs bring this claim for negligent infliction of emotional distress against Defendants Livni, Moskowitz, Chamdani, Darmony, Yalumi, Boltin, Gilead-Meshulam, Bergman (the Israeli

Defendants) because the Israeli Defendants facilitated, assisted, aided, abetted, materially supported, and incentivized acts of extortion against divorced men in Israel – including the Plaintiffs.

152.    The Israeli Defendants knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets.

153.    The Israeli Defendants intended or knew or upon reasonable reflection or investigation should have known, that their conduct would lead to the death of or injury to innocent persons and resulting severe emotional distress.

154.    The Israeli Defendants intended, knew, or should have known that the commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets would create grief, devastation and emotional injuries.

155.    The actions of the Israeli Defendants were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those tortured and abused, and the extended family members, especially children and the elderly.

156.    As a direct and proximate cause of intentional misconduct and/or reckless disregard for human life of the Israeli Defendants; Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

157.    The Israeli Defendants, by engaging in this unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

158.    As a proximate result of Defendants' acts or omissions Plaintiffs suffered the damages described.

159.    As a further proximate result of Defendants' acts and the consequences proximately caused by them, as hereinabove alleged, Plaintiffs suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

160.    To date Plaintiff Newman lost over $300,000; spent over $20,000 on legal expenses, over $10,000 on therapy spent over 1,000 hours, loss of work at $60,000 per year, is now impoverished without his former assets.

161.    Plaintiff Zamansky lost lost over $50,000; was disengaged from his child over a year, spent over $20,000 on legal expenses, over $5,000 on therapy spent over 1,000 hours, is now impoverished without his former assets.

162.    Plaintiff Weisskopf lost over $1 million; was disengaged from his children over a year, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career at $60,000 per year, is now impoverished without his former assets.

163.    Plaintiff Eliahu lost over $1 million, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career exceeding $50,000 per year, is now impoverished without his former assets.

164.    Plaintiff Silberman lost over $50,000; was disengaged from his child for several years, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career over $50,000 per year, is now impoverished without his former assets.

165.    The emotional distress suffered by Plaintiffs was serious or severe.

166.    Plaintiffs were injured by the actions of the Defendants, including false arrests and baseless detentions, a massive libelous "character assassination", extended periods of disengagement from children, Post Traumatic Stress Disorder, sleep deprivation, heightened emotional nervousness, suicidal tendencies, need for painkillers and medications, loss of wages or earning capacity, loss of job, loss of reputation, and actual impoverishment.

**WHEREFORE**, Each Plaintiff requests judgment in his favor and against each of the Israeli Defendants in an amount in excess of $5,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and an Order to prevent the Israeli Defendants from ever again violating rights and intentionally undertakings in violation of the law of nations.

## COUNT THREE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (All Plaintiffs v. Israeli Defendants)

167.    Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

168.    Plaintiffs bring this claim for negligent infliction of emotional distress against the Israeli Defendants because the Israeli Defendants facilitated, assisted, aided, abetted, materially supported, and incentivized acts of extortion against divorced men in Israel – including the Plaintiffs.

169.    The Israeli Defendants knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets.

170.    The Israeli Defendants intended or knew or upon reasonable reflection or investigation should have known, that their conduct would lead to the death of or injury to innocent persons and resulting severe emotional distress.

171.    The Israeli Defendants intended, knew, or should have known that the commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets would create grief, devastation and emotional injuries.

172.    The actions of the Israeli Defendants were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those tortured and abused, and the extended family members, especially children and the elderly.

173. As a direct and proximate cause of intentional misconduct and/or reckless disregard for human life of the Israeli Defendants; Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

174. The Israeli Defendants, by engaging in this unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

175. As a proximate result of Defendants' acts or omissions Plaintiffs suffered the damages described.

176. As a further proximate result of Defendants' acts and the consequences proximately caused by them, as hereinabove alleged, Plaintiffs suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

177. The emotional distress suffered by Plaintiffs was serious or severe.

178. Plaintiffs were injured by the actions of the Defendants, including false arrests and baseless detentions, a massive libelous "character assassination", extended periods of disengagement from children, Post Traumatic Stress Disorder, sleep deprivation, heightened emotional nervousness, suicidal tendencies, need for painkillers and medications, loss of wages or earning capacity, loss of job, loss of reputation, and actual impoverishment.

**WHEREFORE**, Each Plaintiff requests judgment in his favor and against each of the Israeli Defendants in an amount in excess of $5,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and an Order to prevent the Israeli Defendants from ever again violating rights and intentionally undertakings in violation of the law of nations.

## COUNT FOUR
### FINANCING, AIDING AND ABETTING ACTS OF RACKETEERING
#### (Plaintiffs v. Financial Defendants)

179.    Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

180.    Defendants NIF, IFCJ, Summers, Hagee, JIJ, WIZO, Na'amat, PEF, JAFNI, JAFI, (Financial Defendants) finance enterprises in Israel that support, promote, and lobby for torturous extortion of divorced men and their families the Plaintiffs.

181.    Defendants Summers, Hagee, IFCJ, and JIJ collect donations from evangelical Christians; who themselves believe in the sanctity of marriage, preserving the traditional family, and the importance of fathers in the lives of their children – and use a portion of those donations to support breaking up families and extorting divorced fathers thereafter.

182.    Defendants NIF, WIZO, Na'amat, PEF, JAFI and JFNA collects donations from Jewish communities all over North America and use a portion of those donations to support breaking up families and extorting divorced fathers thereafter.

183.    The Financial Defendants do not tell their donors that part of their monies go to enterprises in Israel that exploit divorce to brutally extort billions out of divorced fathers and contribute to the growing number of loss of Jewish lives by suicide.

184.    The financing of such anti-male activities and other attacks committed by the Financial Defendants constitute a violation of the law of nations.

185.    The prohibition against financing activities that are in contravention of international human rights rests on a clear and definite norm of customary international law universally accepted by the civilized world.

186.    Consistent with its condemnation of gender hate financing, the world community has also joined in defining who can be held liable.

187.    The Financial Defendants knowingly, intentionally, and purposefully, directly and indirectly, aided and abetted, intentionally facilitated, and/or recklessly disregarded racketeering activities.

set forth herein.

2.      Defendants availed themselves of the jurisdiction of this Court by directing and calculating their racketeering in concert towards assets located in the United States.

3.      Defendants took the risk that their conduct would yield repercussions in this District and be contested in this Court.

4.      Defendants devised a scheme, not in their official capacity, but as co-conspirators to overtake the Plaintiffs' assets because of their gender and/or national origins and/or citizenship.

5.      Defendants' conduct against Plaintiffs was extreme, outrageous, intentional and fraudulent.

6.      Defendants planned their conspiracy in advance as evidenced by their long histories of engaging in ongoing concerted racketeering behavior.

**WHEREFORE**, Each Plaintiff prays for a judgment in his favor and against each Defendant, as follows: (A) For general damages in the sum exceeding $75,000; (B) For costs of suit incurred herein; (C) For maximum allowable punitive damages; (D) For maximum allowable interest rate; and (E) For such other and further relief as the court may deem proper.

## JURY DEMAND

        Plaintiffs hereby demand a trial by jury.

Respectfully submitted by:

                                                Dated:  September 25, 2016.

Dotan Newman
Rachel 7/1
Tel Aviv, ISRAEL 6404708
011-972-54-233-6321

Michael Zamansky
P.O. Box 31913
Jerusalem, ISRAEL  94101
011-972-52-620-3985

R. David Weisskopf, pro se
P.O. Box 33050
Jerusalem, ISRAEL  94130
(847) 230-4756

Eitan Eliahu
7162 Galli CT
San Jose, CA 95129
(605) 823-5028

Dan Silberman
6A Yizchak Ave
Haifa, ISRAEL  34482
011-972-53-728-5770