IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION


DOTAN NEWMAN, pro se,                                    )
MICHAEL ZAMANSKY, pro se,                                )          AMENDED
R. DAVID WEISSKOPF, pro se,                              )          COMPLAINT
EITAN ELIAHU, pro se,                                    )          **JURY TRIAL**
DAN SILBERMAN, pro se,                                   )          **DEMANDED**
ELDAD GIDON, pro se,                                     )
YAKOV BOSSIRA, pro se,                                   )
                                                         )
                          Plaintiffs                     )
                                                         )
        VS.                                              )
                                                         )
JEWISH AGENCY FOR ISRAEL, NEW ISRAEL FUND,               )     **1:16-CV-7593(WHP)**
JEWISH FEDERATIONS OF NORTH AMERICA, NA'AMAT,            )
WOMEN'S INTERNATIONAL ZIONIST ORGANIZATION,              )       **JUDGE PAULEY**
PEF ISRAEL ENDOWMENT FUND, TZIPI LIVNI,                  )
SHMUEL CHAMDANI, NA'AMA BOLTIN,                          )
MIRIAM DARMONY, AVIGAIL YALUMI,                          )
EINAT GILEAD-MESHULAM, TOMER MOSKOWITZ,                  )
CLANIT BERGMAN, JOHN HAGEE,                              )
INTERNATIONAL FELLOWSHIP OF CHRISTIANS & JEWS,           )
JERUSALEM INSTITUTE OF JUSTICE, CARY SUMMERS,            )
ORIT AVIGAIL YAHALOMI, ZEV GABAI, ARIEL LAGANA,          )
MICHAEL DUWANI, ALON SALEH, NOA REGEV,                   )
AMERICAN FRIENDS OF BAR ILAN UNIVERSITY, and             )
JEFFREY ROYER,                                           )
                                                         )
                          Defendants.                    )


        COMES NOW, Plaintiffs, pro se, for their Complaint against the Defendants, and state as

follows:

A.      **INTRODUCTION**

    1.  Plaintiffs bring this action against Defendants for alleging a far-flung conspiracy, scheme and

plan to defraud and extort funds from Plaintiffs and others.  This scheme has two parts, one requires

persons such as Plaintiffs who are wrongfully accused of being "abusive" fathers or "deadbeat dads"

that can be used as examples for advertisements used for fund raising by certain Defendants and a

second part to create that pool of "abusive" fathers through wrongful means and extortionate activities. The two parts of the scheme work together as an association in fact, for their own profit and in order to stigmatize Plaintiffs and others. Plaintiffs are located in several countries, including the United States and Israel.

2.     As part and parcel of the scheme to extort funds from Plaintiffs, certain Defendants specifically entered into fund raising activities for their own benefit and profit while demeaning Plaintiffs and falsely accusing them, in public and in private, of being poor, abusive and "deadbeat" fathers. Defendants even went so far as to wrongfully coerce Plaintiffs' ex-wives, who were induced through financial and other means to participate in the scheme. These Defendants have worked in tandem with Defendants in Israel, providing "services" to them as they implement their part of the scheme, to create a pool of fathers from whom to extort funds. As part of the plan and scheme to extort funds from Plaintiffs, Defendants, and the Israeli Debt Collections Office had Plaintiffs' ex-wives falsely accuse Plaintiffs of not paying child support when, in fact they had paid such support or attempted to pay the funds and such payment was not accepted. The Debt Collections Office is charged with the enforcement and collection of, among other things, child support and other similar payments. The Debt Collections Office's collection methods include issuing arrest warrants and charging interest and fees. Moreover, the Debt Collections Office oftentimes collects debts without judicial imprimatur.

3.     Specifically, Defendants Na'amat and Women's International Zionist Organization ("WIZO") encourage ex-wives to file claims in the Debt Collections Office, whether actual or fictitious, claiming delinquency in child support. The children will at times be removed to boarding schools owned and operated by Na'amat and/or WIZO. The "delinquent" fathers are then charged for the cost of the schooling.

4.     These fathers are then used by Na'amat, WIZO and the rest of the Fund Raising Defendants in advertising to obtain donations.

5.     Additionally, Plaintiffs generally are forced to pay the wrongful and extortionate "debts" in the

form of American bank notes, assets in the United States or other similar form, which increase the cost of the payments for no apparent purpose.

6.     The registrars and individuals associated with the Debt Collections Office are referred to herein as the Israeli Defendants.

7.     Indeed, the United Nations Committee on Civil and Political Rights, in the Report of the Coalition of Children and Family(Israel) to the U.N. Committee on Civil and Political Rights, dated July, 2012 (the "Committee Report"), specifically set forth the illegal and wrongful procedures and policies regarding the treatment of fathers in Israel, and especially with regard to the Debt Collections Office. The Debt Collections Office frequently will garnish a parent's salary in amounts in excess of the salary itself, making it impossible not to run a deficiency. This, then, creates a debt because the money simply is not there, and allows for the seizure of all assets and arrest.

8.     As to the Defendants located in the United States, referred to herein as the Fund Raising Defendants, their part of the scheme includes the acts described more fully herein as follows:

        **a.**   These Defendants enlisted the Debt Collections Office as a substantial tool to wrongfully, illegally, and arbitrarily place fathers they are supposed to be collecting funds from in jail, arbitrarily increase the funds owed for no reason, harass and intimidate family members of the father who is paying money to them, and even seize the assets of these family members.

        **b.**   For example, the Debt Collections Office wrongfully refused to accept payments from Plaintiffs, and arbitrarily and capriciously, and with no legal or judicial basis altered and changed the amount owed and/or charged excessive fines for the failure to pay when payment was actually made, sought police enforcement and arrests of purportedly delinquent fathers with no basis in fact or law, and even went so far as to seek threaten and seek funds from family members for these improper payments. The Debt Collections Office through certain Defendants, contacted family members of certain

Plaintiffs, threatened them and required them to make the extortionate payments Plaintiffs either could not or have refused to make. The Defendants who used Plaintiffs, and others, in fund raising named and libeled these fathers by falsely accusing them of being "deadbeat dads" or "abusive fathers" to raise funds purportedly to help the families or attempt to assist in "bringing them to justice". This scheme and plan was solely for the profit of the Defendants and the Debt Collections Office and is wrongful. Plaintiffs have suffered material losses as a result of their actions. In some cases, Plaintiffs have remained in hiding to avoid ridicule and false imprisonment.

c. Defendants the Jewish Agency for Israel, the New Israel Fund, the Jewish Federations of North America, Na'amat, the Women's International Zionist Organization, PEF Israel Endowment Fund, John Hagee, the International Fellowship of Christians and Jews, the Jerusalem Institute of Justice, American Friends of Bar Ilan University, Jeffrey Royer, and/or Cary Summers (the "Fund Raising Defendants") obtain information from certain Defendants in the Debt Collections Office and act in concert to raise money for their own profit and purposes and, as part of the scheme, entice ex-wives, whether in the United States, Israel, or elsewhere, to file demands for payment with the Debt Collections Office and have the Debt Collections Office, in certain circumstances, turn children over to them for daycare or full time care which the "delinquent" parent is obligated to pay. The Fund Raising Defendants and the Defendants in the Debt Collections Office operate in concert in an association in fact to extort money from both fathers, on the one hand, and well-meaning Americans donating money to what they perceive to be charitable organizations assisting wives and children not receiving what courts have ordered in child or spousal support.

d. The Fund Raising Defendants and the Defendants in the Debt Collections Office knowingly and deliberately participated in a plan and scheme to materially damage and

obtain undue profits from Plaintiffs, as detailed more fully herein, and worked hand in hand for their own benefit, with the Fund Raising Defendants profiting off the fund raising done purportedly for the purpose of bringing Plaintiffs to justice, but in fact were for their own profit, and the Defendants in the Debt Collections Office profiting from the nonexistent delinquencies in child support, improper fees, charges, and unilateral increases in support amounts. As detailed more fully in this Amended Complaint, Defendants operated a criminal enterprise through an association in fact by and between themselves and the Debt Collections Office to publicly demean humiliate, and materially damage Plaintiffs and gain profit for themselves through the fund raising and the extorted funds over and above the child support owed, if any.

9.      As a direct result of the scheme alleged herein, Plaintiffs all have sought and are under psychological and/or psychiatric counseling and treatment.


**B.      JURISDICTION AND VENUE**

10.     The Court has jurisdiction over Plaintiffs' claim under the Racketeer Influenced and Corrupt Organization Act (RICO) 18 U.S.C. 1961 *et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable Court deems just and proper under all circumstances which have occasioned this amended complaint.

11.     The Court has jurisdiction over Plaintiffs' claim subject to RICO 18 U.S.C. §§ 1964(a) and (c).

12.     Plaintiffs also invoke the supplemental jurisdiction of this Court, 28 U.S.C. §§ 1367, over claims based upon laws of the State of New York.

13.     All Defendants are aggregated as a co-wrongdoer and as such it is necessary for Defendants' disposition of justice in association with local co-Defendants.

14.     Venue is proper in this District because several of the Defendants, and specifically the Fund Raising Defendants, have their principal place of business and are located in this District.

**C.     PARTIES**

15.     Plaintiff Newman is a citizen of both the United States and Israel.  Plaintiff Newman is the biological father of Ori Newman (age 19); and Minors, EL (age 17), N (age 15), G (age 11), I and ET (infant twins aged 7 months).  Minors EL and ET are handicapped children who are completely dependent upon Plaintiff Newman.

16.     Plaintiff Zamansky is a citizen of both the Ukraine and Israel.  He is the biological father of Minor N (age 2).

17.     Plaintiff Weisskopf is a citizen of both the United States and Israel.  Plaintiff Weisskopf is the biological father of Minors; L (age 13), N (age 11), and M (age 9) with legal parental rights.   Among other things, Plaintiff Weisskopf has donated money in the past to the Fund Raising Defendants prior to his knowledge of the scheme alleged herein.

18.     Plaintiff Eliahu is a citizen of the United States and Israel and resides in the United States.  He is the biological father of Karen Eliahu (age 21) and Joseph Eliahu (age 19) who are American citizens residing in California.  Both children are handicapped and continue to depend on Plaintiff Eliahu for their needs.

19.     Plaintiff Silberman is a citizen of the United States and Israel.  He is the biological father of a minor aged 9.

20.     Plaintiff Eldad Gidon is a resident of the United States and citizen of Israel. He is the father of Minor Y (age 6) and Minor B (age 3).

21.     Plaintiff Yakov Bossira is a citizen and resident of Israel. He is the biological father of Minor E (age 11) and Minor H (age 10).

22.     Defendant, Jewish Agency for Israel, Inc. (JAFI) is located at 633 3rd Ave, 21st Floor

New York NY 10017.  Defendant JAFI was established in this District in 1929 and the Israeli

government granted them governmental powers under the Jewish Agency Law of 1952. Defendant

JAFI continues to be obligated to comply with all the laws of the United States under the personal

jurisdiction of this District.  For decades Defendant JAFI has served as the main umbrella organization

for the racketeering scheme described herein.

23.     Defendant New Israel Fund ("NIF") is a U.S. based 501(c)(3) organization located in New York

with an address of 330 Seventh Avenue, 11th Floor, New York, NY 10001-5010.  Defendant NIF raises

millions of dollars in this District and uses a portion of those funds to pay improper kickbacks to

Israelis and others to induce them to convince ex-wives to file claims with the Debt Collections Office

to advance the scheme alleged herein.  Their agents in Israel specifically recruited ex-wives of

Plaintiffs Newman and Weisskopf to claim and pursue bogus "debts" as a part and parcel of the

extortion scheme alleged herein.

24.     Defendant, Jewish Federations of North America, Inc. (JFNA) is located at 25 Broadway;

#1700; NY, NY 10004-1010.  Defendant JFNA oversees fund raising and distribution of $3 billion

annually from Jewish communities all over North America in partnership with Defendant JAFI and the

Israeli government[1] from this District.  In reality JNFA oversees the fund raising and other efforts of

the Fund Raising Defendants herein and directs the fund raising portion of the racketeering scheme

alleged herein.

25.     Defendant Na'amat, Inc. (Na'amat) is a non-profit corporation at 505 Eighth Ave; Suite 2302 at

New York, NY 10018.  Defendant Na'amat promotes itself as, "the largest and leading women's

movement in Israel."  They portray women as weak victims who need "legal aid" and "domestic

violence support" against men.  However, instead of helping women and children and protecting them

---

1  http://p2g.jewishagency.org/partnership-regions

from truly abusive fathers, Defendant Na'amat exploits women and children for extortion against men and their relatives to demean, harass and collect funds from them not owed. They also provide child care, and housing for children and, through its relationship with the Debt Collections Office, has children placed with it as opposed to fathers, family members or mothers even if they have no history of failing to pay support or abuse. They specifically interfered with the, among others, the families of Plaintiffs Zamansky, Bossira, and Eliahu, participated in and aided in the extortionist scheme, and had child placement directed to them in these cases. In addition, Na'amat has meddled in hearings in the Israeli Knesset that investigated the Debt Collections Office.

26.    Defendant Women's International Zionist Organization, Inc (WIZO) is a not-for-profit organization located at 950 3rd Ave at New York, NY  10022.  Defendant WIZO claims to operate, "over 800 social welfare projects including child care centers, schools, shelters for battered women, homes for girls"  These centers have been the subject of shockingly egregious scandals against women and children.  Instead of helping women and children, Defendant WIZO exploits women and children for extortion against men and their relatives in a manner similar to Na'amat and provides services similar to Na'amat. In addition, WIZO and Livni have raised funds on behalf of each other and has provided materially false and misleading information regarding divorced fathers, including Plaintiffs herein, to targets of fund raising and others. WIZO directly and specifically participated in the extortionist scheme as to Plaintiffs Eliahu and Bossira.

27.    Defendant, P.E.F. Israel Endowment Fund, Inc. (PEF), is a not-for-profit corporation in this district.  Defendant PEF is responsible for funding numerous radical anti-father organizations bent on the destruction of the traditional family without funding a single organization that promotes fatherhood, healthy family relationships or assisting disabled single fathers who have been severely traumatized by Defendants' extortion. In addition, PEF participates with the other Fund Raising

Defendants in knowingly aiding and abetting the extortion scheme and using information gained from the Debt Collections Office, whether accurate or wholly false, for its fund raising efforts.

28.     Defendant, Tzipi Livni resides at #8 Nisan Cohen St.; Tel Aviv, Israel.  Upon information and belief, she also maintains a residence in Brooklyn, New York.  She was employed as the Israeli Minister of Justice until December 2014 with responsibility over the Administrator General and Official Receiver and the Debt Collections Office.  Meanwhile, she obstructed investigations into the extortion practices alleged herein in the Debt Collections Office[2], including an investigation against co-Defendants related to this matter. Livni aided and abetted the scheme alleged herein and, upon information and belief, knew of and approved of the extortion scheme operated through the Debt Collections Office.

29.     Defendant, Shmuel Chamdani, whose service address is 37 Jeremiah St.; Building A; Jerusalem, ISRAEL  9134102 is in charge of supervising policies and procedures at the Debt Collections Office and is a Registrar therein. Defendant Chamandi has knowingly and deliberately participated in the scheme alleged herein for his own purposes and profit. As a retired judge, he gives the appearance credibility under color of law to the Debt Collections Office. However, he has aided and abetted the extortion scheme alleged herein by interfering with and obstructing investigations into the Debt Collections Office when complaints relate to serious violations of law, including fraud, extortion, false arrests and imprisonment, and wrongful death are brought and has participated in covering up the wrongs alleged herein.

30.     Defendant, Tomer Moskowitz, whose service address is 37 Jeremiah St.; Building A; Jerusalem, ISRAEL  9134102 is a retired judge and manager of the Debt Collections Office. Defendant Moskowitz has knowingly and deliberately participated in the scheme alleged herein for his own purposes and profit.  As a retired judge, he also creates and appearance of credibility under color of law

2   http://www.ynetnews.com/articles/0,7340,L-4515570,00.html

to the wrongful acts alleged herein within the Debt Collections Office by rewarding registrars who violate the law and proper procedure, to secure increased budgets funding and other emoluments. Among other things, Defendant Moskowitz has issued *ex parte* orders and ordered numerous false arrests,  of Plaintiffs and others, including Plaintiff Weisskopf.  When Plaintiffs requested a criminal investigation against Defendants Darmoni and Yalumi, Defendant Moskowitz acted under color of law to cover up their crimes and block any investigation.

31.     Defendant, Na'ama Boltin is a registrar at the Debt Collections Office.  She acts under color of law and has issued wrongful orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt.  In the case of Plaintiff Eliahu, she turned an award from a California court in his favor into an Israeli award in favor of his ex-wife. Among other things, as described more fully herein, she ignored court orders, issued *ex parte* wrongful, illegal and improper orders and strong-armed the extended family of Plaintiff Eliahu.

32.     Defendant, Miriam Darmony, is a registrar at the Debt Collections Office.  Defendant Darmony acts under color of law and has, as a part of the scheme alleged herein and issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt. As part and parcel of the scheme alleged herein, she has ignored lawful, valid orders of courts and harassed the relatives of certain Plaintiffs herein, including elderly relatives in the United States.

33.     Defendant, Avigail Yalumi, whose service address is 12 Beit Hadfus St.; Jerusalem, ISRAEL 9134102 is a Registrar at the Family Court in Jerusalem.  Defendant Yalumi has acted under color of law and has, as part of the scheme alleged herein, issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt. Among other things, Yalumi has obstructed appeals to the family court by fathers appealing Debt Collections Office rulings.

34.     Defendant, Einat Gilead-Meshulum, whose service address is HaRofe 15a at Binyamina, ISRAEL is a registrar at the Debt Collections Office.  Defendant Gilead-Meshulum has acted under color of law and has, as part of the scheme alleged herein, issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt. In the case of Plaintiff Zamansky, she repeatedly kept the debt open even after it was paid off while adding exorbitant made-up fees.  Her tactics include *ex parte* wrongful and/or illegal orders and strong-arming extended family including the elderly, as happened to Plaintiff Zamansky.

35.     Defendant, Clanit Bergman, whose service address is Derech Hasharon 12; Sharona Center; Kfar Saba, ISRAEL - is a registrar at the Debt Collections Office.  Defendant Bergman has acted under color of law and has, as part of the scheme alleged herein, issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt. Among other things, she has ignored valid court orders, issued *ex parte* wrongful and/or illegal orders and false arrests.

36.     Defendant, Zev Gabai is a registrar at the Debt Collections Office.  He was trained in a program sponsored by Defendant American Friends of Bar Ilan University to act under color of law, ignore valid court orders, and issue wrongful orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt.

37.     Defendant, John Hagee, is a pastor who broadcasts his television program from San Antonio, TX located at: 239 N Loop 1604 W, San Antonio, TX 78232.  (Tel. 1-210-494-3900).  Defendant Hagee founded John Hagee Ministries and Cornerstone Church in 1994.  The profile on Defendant Hagee's fundraising website boasts to be, "the largest pro-Israel organization in the United States".  Defendant Hagee collects donations from Evangelical viewers in the United States, and sends the funds to subsidiaries of Defendants JAFI, JFNA, and WIZO that portray Jewish fathers as 'violent'.  While

Defendant Hagee's donors believe that traditional family values are essential, he sends their donated money to organizations that advocates widely for the disengagement of children from their fathers. This false propaganda exposes fathers in Israel to abuse, wrongful harassment and a loss of assets and funds.

38.     Defendant International Fellowship of Christians & Jews (IFCJ) has a service address of: 30 North LaSalle Street, Suite 4300, Chicago, IL 60602-3356 (Tel. 1-800-486-8844).  IFCJ was founded as an outreach to evangelical Christians.  While donors to Defendant IFCJ believe in the strength of traditional family values, Defendant IFCJ sends money to organizations that are devoted to the break-up of Jewish families, annihilation of men in divorce, and disengagement of fathers from children. Defendant IFCJ broadcasts a fundraising video all over North America which defames Jewish fathers in Israel as violent wife-beaters who threaten the lives of their wives and children[3].

39.     Defendant, Jerusalem Institute for Justice (JIJ) has a service address of 4963 Sesame Street at Cincinnati, OH  45244 (Tel. 1-303-502-6649).  Defendant JIJ's mission statements have changed multiple times with the exception of promoting Calev Myers.  Myers has a history of doing business with criminal elements and buying off political leaders.  For example, one of the founding directors at the Jerusalem office is a member of the Israel Women's Network (IWN) who granted Defendant JIJ access to political leaders in exchange for defrauding evangelical Christians to donate to a radical agenda[4] to break up traditional families and devastate loving fathers such as Plaintiffs. The Defendant American Friends of Bar Ilan University (AFBIU) and its subsidiary the Rackman Center frequently works with JIJ and operates in largely the same manner as JIJ.

40.     Defendant, Cary Summers has a service address of: Museum of the Bible Corporate Office -7507 S.W. 44th Street, Oklahoma City, OK 73179. (Tel. 405-745-1100)**.**  Defendant Summers is

---

3 http://youtu.be/47MvXmLPvCE

4   One of the IWN politicians publicly called on ending marriage and fatherhood  using false data:
     https://www.youtube.com/watch?v=qgzqtFJq89E

president of the Bible Museum, a subsidiary of Hobby Lobby.  He also helped establish the Jerusalem Institute for Justice, a radical feminist organization that lobbies draconian policies which demonize Israeli men to the Israeli judiciary and legislature.  He promotes himself as a conservative Evangelical to mislead well-meaning Christian donors, who support traditional family values, into financing the destruction of Israeli families via the Jerusalem Institute for Justice – and specifically one or more of the Plaintiffs.

41.     Defendant Alon Saleh is a registrar with the Debt Collections Office. As a part and parcel of the scheme alleged herein, Saleh abused Saleh's purported power and the power of the Debt Collections Office for Defendant Saleh's own gain and in order to perpetuate the scheme alleged herein. Defendant Saleh has acted under color of law and has, as part of the scheme alleged herein, issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt.

42.     Defendant Noa Regev is a registrar with the Debt Collections Office. As part and parcel of the scheme alleged herein, Regev abused Regev's purported power and the power of the Debt Collections Office for Regev's own gain and in order to perpetuate the scheme alleged herein. Defendant Regev has acted under color of law and has, as part of the scheme alleged herein, issued wrongful and illegal orders against Plaintiffs and others without legal basis or justification based upon fictitious and/or wrongful claims of delinquency and debt.

43.     Defendant Jeffrey Royer is a director of Defendant International Fellowship of Christians and Jews (IFCJ) operating in Canada and formerly a director of the Jerusalem Institute for Justice (JIJ) as well as the IFCJ operating in the USA. Royer, as part and parcel of the scheme alleged herein, raised and raises money through Defendants IFCJ and JIJ. Royer uses a portion of the funds raised in order to bribe certain Israeli officials in order to incentivize them to ignore the extortion scheme alleged herein.

44.     Defendant American Friends of Bar Ilan University is located in this district and its subsidiary Rackman Center, located in Ramat Gan, Israel, raises money from, among others, United States citizens. The funds raised by American Friends of Bar Ilan University, in part, is provided to the Rackman Center. The Rackman Center has a contract to train registrars in the Debt Collections Office as well as social workers. Among others, Defendant Gabai was trained by the Rackman Center. The Rackman Center, upon information and belief, specifically trains social workers and registrars to the disadvantage of fathers with the overt agenda favoring ex-wives in all instances over fathers and husbands. According to the Rackman Center's fiscal year 2015 Annual Report, the Rackman Center states that it seeks to ensure the illegal acts alleged herein remain unchanged and, "…is paving the way to ensure that no change happens without our involvement or without us impacting the change." As a part and parcel of the scheme alleged, American Friends of Bar Ilan University and the Rackman Center knowingly participates in and profit from the extortion and fund raising scheme alleged.

## D.  HISTORCAL BACKGROUND

45.     The Debt Collections Office in Israel was established in 1967 as a national "collection agency" that, in part, collects from divorced husbands' child support and other payments in Israel. In reality, it has been used by certain Defendants and others as an extortion racket affecting more than 80,000 divorced fathers since 2009.  Defendant Livni oversaw the Debt Collections Office during her tenure as Minister of Justice. Under her authority, Defendants Darmony, Yalumi, Boltin, Gilead-Meshulam, Bergman, who were engaged in piecemeal forms of extortion from "delinquent" fathers for their own gain, under the encouragement of Livni, stepped up their extortion tactics described herein, including the issuance of wrongful and/or illegal orders, issuing extra-judicial demands and orders, arbitrarily altering the amounts owed, and improperly charged improper fees on purported debtors. These were done without judicial approval.  Defendants Moskowitz and Chamdani are former judges who and knowingly participated in the predicate acts, including creating the appearance of debts owed to

support the extortion efforts of the Debt Collections Office, including arrests, false imprisonment, including restraining persons even during medical emergencies or when medical help is needed, invading privacy, demanding payment of the arbitrary and excessive "debts" they created from extended family of purported debtors, demanding made-up "fees and interest", violating court orders – both American and Israeli, and forcing victims to borrow on the black market with kick-backs to the Debt Collections Office and the Israeli Defendants.

46.     Defendant IFCJ was formed in 1983 as the Defendants' outreach to Evangelical Christians. They have been abusing their tax-exempt status with the IRS to commit a massive fraud on evangelical donors all over North America.  For example, they televise a fundraising video that falsely portrays Jewish men as murderous wife-beaters who endanger their children's lives[5].  Despite having been confronted on such fraud in 2012, Defendant IFCJ continues to act in the same fashion, demonizing Jewish men to evangelical donors to fraudulently raise money under false pretenses, including providing charges and claims against Plaintiffs and others for their own benefit and profit.

47.     Defendants JAFI, JFNA, IFCJ, WIZO, and/or their affiliates recruited Defendant Hagee to join their racketeering network.  He formally incorporated his non-profit in 1994 after informal connection with the co-Defendants for at least 10 years.  Since then he has defrauded well-meaning Evangelicals out of millions thinking they have been "blessing Israel" when in fact their donations have funded extreme racketeering as described below.

48.     In 2005 at least one director from Defendant IFCJ, Defendant Royer, and Defendant Hagee recruited the Myers family and Defendant Summers to join the racketeering network.  In 2006 Plaintiff Weisskopf retained Calev Myers as legal counsel for the Love for Israel Relief Fund (LIRF) without knowing that these Defendants were part and parcel of the racketeering scheme alleged herein. Though Plaintiff Weisskopf's intent was to advocate for orphans and at-risk children, Myers intended to set up

---

5   https://www.youtube.com/edit?o=U&video_id=47MvXmLPvCE

multiple shell enterprises for the association in fact of Defendants, among others.  For example, Myers received a $100,000 "donation" from Arcadi Gaydamak[6].  Meanwhile Myers was entangled with a drug cartel in South America and, as a result, had to pay off a $30,000 debt for Matthew Wada who was convicted of fraud in this District in 2014[7].  Myers forced Knesset Member Yair Peretz, who was also charged with fraud, upon Love for Israel and forced it to retain him as an employee for several months.  When Peretz proposed laundering $2 million from the mafia through a trust account under Myers' control and into Love for Israel, Plaintiff Weisskopf demanded he disentangle from Myers' corrupt sources.  After Plaintiff Weisskopf and Myers parted company the Myers family set up a few shell enterprises, including Defendant JIJ in 2011.  Defendant Summers exploits his influence and position to defraud well-meaning Christians to donate to Defendant JIJ which actually has an agenda that is contrary to Evangelical beliefs.

49.    The Defendants, as part and parcel of the extortion scheme, keep files open on illegal and paid debts after knowing they should be closed in order to create the appearance of delinquency rates that are not, in fact, accurate, in part to  petition the Israeli government for artificially higher budgets and generate in order to obtain kick-backs from loans taken by wrongfully charged fathers from street lenders so that these fathers may avoid wrongful, improper and false imprisonment. As a part of this scheme, the Defendants have routinely ignored judicial decisions requiring them to cease and desist these activities so they can profit from them.

50.    Defendant American Friends of Bar Ilan University, through its subsidiary the Rackman Center, both raises funds in the United States and is paid by the Debt Collections Office to train registrars therein to extort funds from fathers, charge them usurious interest rates, and develop methods to harass and harm them.

---

6  http://www.forbes.com/lists/2006/81/biz_06israel_Arkady-Gaydamak_C8TS.html
7  http://www.nydailynews.com/new-york/nyc-crime/duo-duped-20-manhattan-apartment-seekers-60-000-article-1.1941579

51.     While leading the charge against Plaintiffs and others who are victims of the scheme alleged herein, Defendant Livni has, at the same time, spoken out against the acts alleged. In 2014 Defendant Livni removed the power of the Debt Collections Office to engage in the acts alleged herein, including improper collection efforts, jailing of debtors, improper fees and charges, and other acts in all instances but for the collection of alimony and child support debts. For those debts, the power of the Debt Collections Office to, for example, imprison debtors, remained. In doing so, she stated that, "civil imprisonment for non-payment of debt is a serious blow to human rights.  Imprisonment as a collection method is not legitimate as it applies undue pressure in alternative court mediation. Therefore, oftentimes the threat of imprisonment creates tremendous pressure on the debtor and his family, and may result in the debtor being forced to borrow even more money (including in the black market), in order to avoid imprisonment."

52.     After this admission, she singled out thousands of impoverished divorced fathers, including the Plaintiffs, to deny basic human rights and to extort illegal debts.  Instead of changing policies to protect human rights of divorced fathers, she exceeded the power of her office by broadcasting television commercials that called on women "to war" against men in the Debt Collections Office and portrayed otherwise ordinary housewives in military uniforms.  Such draconian policies led to: (A) devastation upon Plaintiff Newman's pregnant wife and handicapped children; (B) trauma upon Plaintiff Zamansky's elderly father; (C) the wrongful death of Plaintiff Weisskopf's grandmother – a native of New York City with no connection to Israel; (D) mental breakdown of Plaintiff Eliahu's mother and sister and homelessness of his handicapped children alongside him; (E) Plaintiff Silberman's mother, a Holocaust survivor, suffering flashbacks from the midnight raid and false arrest against him; (F) Suicide attempt of Plaintiff Gideon's child; and (G) Removal of Plaintiff Bossira's children into dormitories run by Defendants Na'amat and WIZO.

53.     Indeed, even though the Director of the Debt Collections Office, David Madiyoni, informed a Knesset hearing that the acts of Livni and the Defendants in the Debt Collections Office were illegal, and the Knesset hearing adopted policy to prevent these acts, Livni and the Defendants in the Debt Collections Office have continued to disregard this law and maintain the scheme to extort and defraud to this day. The Fund Raising Defendants participated in these hearings, without any other outside organizations permitted, and fought against the policy.

## F.  FINANCIAL ALLEGATIONS

54.     Defendants JAFI, JFNA, PEF, NIF, WIZO, Na'amat, IFCJ, JIJ, and Summers set up shell enterprises in North America to channel private donations and other funds to Israel where it gets co-mingled with funds to carry out "social projects" with enterprises within the Ministry of Justice and Welfare including "Partner Together", "City Without Violence", and "Anti-Human Trafficking".

55.     The Fund Raising Defendants use the United States mail, wires, and other forms of communication to provide materially false and material information to potential donors, as set forth more fully herein, in order to induce them to donate money to them under false pretenses.

56.     Certain Plaintiffs, including Plaintiff Weisskopf, have donated money to the Fund Raising Defendants.

57.     Upon information and belief, these projects are actually instruments to demonize Israeli men and facilitate false claims against them, including illegal debts, for extortion as described herein. This is being done as a part and parcel of the scheme alleged, and with the knowledge and participation of the Debt Collections Office. The Fund Raising Defendants both obtained profits from the scheme through fund raising and funding from the Israeli government.

58.     The Fund Raising Defendants were primarily used as an inducement to divorced wives by having them provide money and services to them in exchange for these ex-wives bringing false claims and making false allegations against their ex-husbands relating to their payment of spousal and child support to them. In many, if not most cases, these child support demands were never ordered by Israeli

or other courts. They were induced by, among others, the Service Defendants to report their ex-spouses to the Debt Collections Office and "Open a file" related to their debt. Once the file was opened, the Debt Collections Office Defendants could engage in the wrongful manipulation of the amounts of the spousal and child support owed and thereby provide examples for the Fund Raising Defendants to raise funds.

59.     The Fund Raising Defendants used the funds raised for a profit to themselves and as a source of funding to continue the scheme alleged. Moreover, the Fund Raising Defendants knowingly assisted and participated in the wrongful allegations brought against Plaintiffs and others. For example, Defendant IFCJ put up "City Without Violence" billboards in municipalities across Israel extolling attempts to obtain funds from Plaintiffs and others through projects such as Defendant N'amat and other Service Defendants.

60.     Defendants JAFI, JFNA, PEF, NIF, WIZO, Na'amat, IFCJ, JIJ, and AFBIU maintain offices in Israel where they closely monitor activities in the Knesset and municipalities nationwide to ensure their interests are protected at each level of government.  They actively participate in creating policies and procedures that ensure the nationwide rackets operate exactly as they demand.

61.     Moreover, Defendants WIZO, Na'amat and others maintain boarding schools in Israel and work with the Debt Collections Office hand in hand to ensure that the Debt Collections Office have delinquency claims for extortion purposes by referring ex-wives, or even current wives, to them through their women's aid services, and, as a *prid pro quo,* the Debt Collections Office assigns children to their boarding school and orders Plaintiffs and other fathers to pay for it.

62.     Accordingly, the Israeli Defendants, operating through and with the power of the Debt Collections Office, profit from the fees and interest charged parents and WIZO, Na'amat and the other Fund Raising Defendants obtain profit both from its fund raising activities using the fictitious "abusive" parents as the draw and by having children from the "abusive" parents placed with them. The Fund Raising Defendants work in concert with the Israeli Defendants and through the power and

authority of the Debt Collections Office to profit at the expense of fathers wrongfully charged with owing child support.

63.     Further, numerous Fund Raising Defendants have institutional and financial ties to the Israeli Defendants and the Debt Collections Office. By way of example, pursuant to the procedures of the Debt Collections Office (1998), at paragraph 8, JAFI is given the authority to confiscate real estate from a purported debtor for no compensation or reason. The Israeli Supreme Court held that this arrangement is unconstitutional, yet the Debt Collections Office and JAFI have continued this arrangement.

64.     In addition, the Israeli government has retained Defendant JAFI as to collect debts of the Debt Collections Office. Indeed, significant amounts of money is paid to Defendant JAFI for these collection efforts. However, the Israeli Defendants and Defendant JAFI know and recklessly disregard the fact that these debts are fictitious. They are merely a profit center for both, and an attempt to extort money from Plaintiffs and others.

65.     The Debt Collections Office, as part of its operations, also hired 100 private attorneys to participate in and purportedly assist in writing and enforcing the rulings of the Israeli Defendants[8]. However, these attorneys are affiliated with and are provided to the Debt Collections Office by Defendants  and maintain their private practices and put the Defendants at an illegal advantage over the clients of other private attorneys and the public, including the Plaintiffs .

66.     In 2015 the criminal charges were filed against several police officers and private investigators for their involvement in an extortion ring in the Debt Collections Office[9].  These police officers and private investigators participated in the extortion racket against debtors, especially divorced fathers, that benefited the Defendants affiliated with them.

67.     Additionally, in 1998 the Debt Collections Office established procedures for the foreclosure on

---

8   http://www.eca.gov.il/index2.php?id=62
9    http://www.4law.co.il/mahash221115.pdf

real estate properties of, among others, the Plaintiffs. The Debt Collections Office then, almost simultaneously signed an agreement with Defendant Jewish Agency for Israel, assigning it the ability to foreclose and take the homes of Plaintiffs, among others, without compensation. Several Plaintiffs have lost their homes in this manner. Upon information and belief, the Israeli government has agreed to and does purchase apartments foreclosed on by Defendant Jewish Agency for Israel in the event there is no private market for the apartments in question. Further, Defendant Jewish Agency for Israel has assigned rights to certain properties to Defendants Na'amat and WIZO.

## G.  FACTUAL ALLEGATIONS CONCERNING THE PLAINTIFFS

### FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF NEWMAN

68.     Plaintiff Newman is the biological father of Ori Newman (age 19); and Minors, EL (age 17), N (age 15), G (age 11), I and ET (infant twins aged 7 months).

69.     Newman's oldest son, Ori, is currently a soldier serving in the military and lives full time on a military base at the expense of the military.

70.     Minors N & G live part-time with their mother and part-time with Plaintiff Newman.

71.     Minors EL, I, and ET are in Plaintiff Newman's full-time custody.

72.     Minors I and ET were born prematurely in 2016 and Minor ET needs frequent hospitalization in the pediatric intensive care unit (ICU) due to injuries and illness related to the premature birth.

73.     Minor EL is a handicapped child and thus has substantial medical and educational needs paid for by Newman.  Newman's ex-wife and the mother of Newman's children, upon the divorce, has completely abandoned all obligations to EL and has not been in Minor EL's life at all for the past four years nor contributed in any way to EL's emotional and physical health and well-being.

74.     Prior to April 2015, Plaintiff Newman's ex-wife joined "Bat Kol", an unincorporated subsidiary of Defendant NIF for Orthodox Jewish lesbians.  By and through NIF and the scheme alleged herein,

NIF and Bat Kol have acted in concert with the Debt Collections Office Defendants to destroy Plaintiff Newman financially and emotionally.

75.     In April 2015, his ex-wife recruited Defendant Clanit Bergman in the Debt Collections Office to collect an unlawful "child support" debt for Minors N & G despite her failure assist in the heavy financial burden she had neglected with Minor EL's special needs. Upon information and belief, the amounts owed to Newman by his ex-wife for the care and feeding of EL as part of the divorce proceedings far exceeds the child support purportedly owed by Newman.

76.     Bergman acted under color of law to deprive him of his rights and caused him to suffer financial loss, severe emotional distress, and other injuries by acting in concert with the Debt Collections Office Defendants and Newman's ex-wife to impose added costs, fees and penalties not justified by the circumstances.

77.     Clanit Bergman arbitrarily and without actual authority added 36,000 shekels ($9,000) a nonexistent "debt" purportedly owed by Newman to his ex-wife.

78.     Thereafter, using the fictitious debt and added fictitious fees as support, Defendant Bergman issued: (A) A stop-order from leaving the country against him, (B) An order freezing all his bank accounts, (C) An order freezing all credit cards, (D) Garnishment against his wages, (E) Excessive interest far beyond international norms, (F) Revoked his driver's license.  Defendant Bergman brought these penalties under her own authority, without a hearing or opportunity to be heard and by fiat.

79.     Thereafter, Plaintiff Newman immediately approached Defendant Bergman to demonstrate the falsity of the charges, and showed proof that a large amount of the claim was an illegal debt and requested access to his bank account to pay the remainder of the debt and pay for his child's special education because his ex-wife was not paying anything at all.

80.     Defendant Bergman ignored Plaintiff Newman's pleas and paralyzed him financially. Newman

obtained a court order lifting the sanctions brought by Bergman, but, in violation of that court order Bergman refused to lift the sanctions. These acts materially harmed Newman, his current wife and the children in his household. Bergman had actual knowledge that she was inflicting injury on the minors in his household, including a handicapped child, as well as his current wife who was pregnant with twins. Bergman's sole interest is and was in continuing the extortion scheme alleged herein.

81.     In June 2015 Plaintiff Newman again requested that at least the monthly child support payments be drawn from his bank account to avoid falling behind on monthly child support for Minors N & G – which was supposed to be Bergman's excuse for freezing all his assets under color of law in the first place.

82.     Bergman rejected his request intentionally, thus putting him in a "catch 22" because he could not access his funds to pay the debt and the funds would not be released until he did so. As a result, Newman, in addition to the increase in the debt because he could not access the funds to pay it, was charged with illegal "interest and fees" far beyond acceptable norms. Since she froze all of his assets in Israel as a result, Newman was forced to borrow funds from the "black market" and from foreign lenders charging substantially higher "foreign fees" and interest rates due to the cross-border nature of the loan.

83.     In reality she was strong-arming him to borrow money from the black market and/or the United States in order to pay the debt instead of supporting his current wife and children.  Even worse is she knew that she was driving his children into poverty as pawns against him – including handicapped children.

84.     After Plaintiff Newman's infants were born prematurely in January 2016, he and his current wife had to practically live at the hospital while also caring for children at home, including their handicapped children.

85.     He again begged Bergman for a temporary deferral of the payments due to his dire financial situation caused by the medical bills and emergency treatment for his children.  Bergman ignored the requests.

86.     Indeed, Bergman knowingly and deliberately extorted far more money from him than the court order allowed or even than what his ex-wife sought from Bergman.  Bergman knowingly acted in furtherance of the scheme to extort money and create the appearance of a delinquent father when Bergman, in fact, knowingly and deliberately placed Newman in a position where he had no choice but become delinquent because she blocked his access to the funds needed to pay any debt, whether real or fictitious, and when he paid it, found ways to increase it beyond what he paid.

87.     Further, Bergman threatened him with additional "special fees" if he were to make further requests for relief from the financial devastation she unleashed on him.

88.     Bergman has, by fiat and without actual authority or basis, taken everything away from Plaintiff Newman including his money, his driver's license, his credit card, his ability to join a corporation or non-profit and even his entire salary.  This violation of his rights has caused Newman egregious emotional distress.

89.     The threat of arrest and imprisonment hangs over his household.  The trauma his children experience every time they think a policeman is going to take their father away from them under color of law in an extortion racket is indescribable emotional distress on his entire family.

90.     Bergman forced Plaintiff Newman to use American monetary payment instruments that incurred substantially higher "foreign fees" and interest. If he did not do so, she threatened him with arrest and imprisonment. Bergman still has not rescinded the order freezing Plaintiff Newman's funds.

91.     Plaintiff Newman requested in writing from Defendants Chamdani, and Moskowitz to investigate the devastating misconduct of Defendant Bergman.  They employed strategies implemented

by Tzipi Livni to obstruct any investigation and neglected to intervene in any way against the above-described racketeering to protect Plaintiff Newman's wife & children or him and their basic human rights.

## FACTS SPECIFIC TO PLAINTIFF ZAMANSKY

92.     Plaintiff Zamansky is the biological father of Minor N (age 2).

93.     Zamansky has security clearance to work in high level security and is licensed as a law enforcement officer.

94.     Plaintiff Zamansky's issues began virtually upon the birth of N. His ex-wife had and has severe emotional issues, and subjected N to significant risks of injury and death. For example, she dangled N out of their apartment window for no apparent reason and threatened to murder the baby by dropping N onto the street below in order to force Zemansky to stay home and care for the child rather than go to work, threatened to spray acid and other dangerous chemicals in N's face for no discernible reason.

95.     As a result of his ex-wife's behavior, Zemansky filed a complaint with the police and they immediately opened a criminal investigation against the mother.  The police recommended prosecuting the mother and requested assistance from a child welfare social worker to determine whether to place N into Plaintiff Zamansky's custody as an infant.

96.     Rather than give custody to Zamansky, who was not living with his ex-wife, Defendant Na'amat convinced authorities to turn N over to their "daycare" services located in Israel without legal or other basis and without Zamansky's approval and permission, despite the fact that Zamansky has full parental rights and guardianship of N. When he went to Defendant Na'amat's "daycare" to see his child, Na'amat's administration refused to allow the visit and barred him from the premises.

97.     During this period, Zamansky was attempting to enforce his parental rights and custody order, by seeking relief through official legal channels because Defendant Na'amat was interfering with those

rights for its own interest and profit, and without legal or judicial approval.

98.     Upon information and belief, Defendant Na'amat wrongfully managed to quash expert

evaluations, police reports (including firsthand police testimony), and eye witness testimonies that all

suggested placing N into Plaintiff Zamansky's exclusive custody as the only psychologically stable

parent during hearings and procedures used by Zamansky to enforce the custody orders he had.

99.     Further, Na'amat wrongfully caused Zamansky to expend substantial sums of money in order to

enforce his parental rights. For example, Na'amat forced him into paying 14,000 shekels ($3,500) for a

parental fitness evaluation performed on both parents, telling him they would not allow him to see his

child if he did not do so.

100.     Due to Na'amat's interference and as part of the scheme alleged herein, Zamansky's visitation

and custody rights with N were severed. Na'amat used its relationship with Defendant Gilead-

Meshulam to manipulate the legal procedure and had themselves retained to "provide daycare" for N

from morning until night and had Gilead Meshulam charge Plaintiff Zamansky for their "services". The

purported reason for the assignment of N to Na'amat was to avoid N's contact with N's mother, despite

the fact that Zamansky was no longer with N's mother. Zamansky was required to pay Na'amat's fees

and charges which were an extreme burden and above normal costs for such services.

101.     Na'amat raises funds in the United States and this jurisdiction using, in part Zamansky and

other similarly situated persons as an excuse for funding for their "daycare" services and wrongfully

claim they need to protect children from delinquent parents, despite the lack of delinquency. Thus, they

received forced payment for their services from Zamansky and funds from American donors using

Zamansky as a reason they need funds, to purportedly protect children from him, who is licensed in law

enforcement, and others like him.

102.     In August 2015 Na'amat pushed the mother of Minor N to open a file against Plaintiff

Zamansky with the Debt Collections Office in Petach Tikvah alleging that, even though child support payments and Na'amat's fees were paid and up to date, Zamansky was delinquent on such payments.

103.    The original registrar in charge of Zamansky's case attempted to resolve the dispute and, when it appeared it would be resolved, upon information and belief, Na'amat manipulated a switch in registrars to Defendant Gilead-Meshulam.

104.    When Defendant Gilead-Meshulam took over the file in November 2015; she has created a "catch 22" scenario, blocking Zamansky's ability to pay his support payments.

105.    Plaintiff Zamansky was paying child support with a credit card, and the balance of his account in the Debt Collections Office was zero. When Defendant Gilead-Meshulum saw that he was paying every month with a credit card, she has decided to freeze his credit card. There are no restrictions on the ability to pay support to the Debt Collections Office with a credit card. This action not only obstructed him from buying essential food for his family, but also obstructed his ability to stay current on child support.

106.    Then, in order to further pressure Zamansky, Defendant Gilead-Meshulam automatically issued: (A) An order freezing all bank accounts, (B) An order freezing all credit cards, (C) Garnishment on all wages, (D) Excessive interest far beyond all legal Israeli and international norms. Gilead-Meshulam issued the order freezing Zamansky's assets without any warning, hearing, chance for Zamansky to be heard or due process.

107.    In December 2015 Plaintiff Zamansky showed proof that the claim was an illegal debt and requested Defendant Gilead-Meshulam close the collection file.

108.    Defendant Gilead-Meshulam ignored his request and paralyzed him financially in violation of the law.

109.    At one point, Zamansky reached out to Gilead-Meshulam for relief because he was the sole

provider and care-giver of his elderly father and was only seeking a relationship with his child.  His plea fell on deaf ears.

110.    Because all his assets have been frozen, Zamansky now must seek funds by borrowing on the black market or seeking payment instruments in the United States at substantially higher fees and interest to pay Na'amat and any child support he previously had no issues paying.  He does not want to be indebted to Israeli criminals, therefore he was forced to make payments through America, generating even higher fees.  Thus, he could only try to satisfy Defendant Gilead-Meshulam's demands through American channels at substantially higher cost.

111.    Defendant Gilead-Meshulam and Na'amat knew or should have known that they were forcing him into a situation where his only option would be to either borrow money on the black market or use American payment instruments to pay the debt, and forcing Plaintiff Zamansky into poverty for no reason.

112.    Plaintiff Zamansky cleaned out every penny from his bank account and his father's bank account in order to pay inappropriate and illegal charges Na'amat and Defendant Gilead-Meshulam, imposed on him.  After the delinquency was paid off she artificially kept the file open with non-existent "interest and fees".  In August 2016, she claimed that there was an artificial open balance of 46 shekels ($11).  Each time he paid what was owed, somehow, there always was an artificial charge added after payment to wrongly and illegally keep jurisdiction with Gilead-Meshulam.

113.    Zamansky, his father and N have suffered material and substantial financial and psychological damage, and injury, as all have suffered trauma as a result of the wrongful and illegal acts perpetrated on them by Na'amat and Giilead-Meshulam.

## FACTS SPECIFIC TO PLAINTIFF WEISSKOPF

114.  Plaintiff Weisskopf the biological father of Minor L (age 13), Minor N (age 11), and Minor M

(age 9). He previously donated money to the Fund Raising Defendants prior to knowing about the scheme alleged.

115.   In July 2012 Shatil, self-described as the operative arm of Defendant NIF, recruited his ex-wife as an activist for them in the Knesset (the Israeli parliament).  Upon information and belief, Shatil paid Weisskopf's ex-wife a bribe from $2 million in tax-deductible donations the Defendant NIF raised at a fund raising banquet in Manhattan, NY purely to induce her to enter into illegal acts to injure Weisskopf.

116.   Simultaneously, Shatil directed his ex-wife to open a file against Plaintiff Weisskopf and arranged for Defendant Darmony in the Debt Collections Office to be given jurisdiction of Weisskopf's case over a fictitious delinquency of 16,000 shekels (approximately $4,000).  Indeed, Plaintiff Weisskopf had prepaid the child support amounts ordered at least 15 years in advance and, in addition, deposited over 19,000 shekels (approximately $5,000) in escrow at the family court in order to ensure that, even if there was a question of payment, sufficient funds were in the hands of authorities to pay any amounts owed. Thus, there is no reason whatsoever for Weisskopf's case to be before the Debt Collections Office.

117.   As part and parcel of Defendants' scheme to injure Defendants, Darmony illegally, arbitrarily and without judicial and legal basis, issued orders specifically designed to injure Weisskopf without basis.

118.   Specifically, from March 2013 to July 2013, Defendant Darmony issued: (A) A stop-order from leaving the country against Plaintiff Weisskopf, (B) An order freezing all bank accounts, (C) An order freezing all credit cards, (D) Garnishment against all income, (E) Excessive and usurious interest far beyond legal Israeli and international norms, (F) A warrant for his arrest.  These orders were issued without judicial or legal basis, were issued *sua sponte* and without allowing Weisskopf a hearing or opportunity to be heard and without due notice, procedure and due process.

119.   In July 2013, Plaintiff Weisskopf needed surgery on an infected cyst in his sinus that was one

millimeter from his optic nerve and brain stem.  He brought a motion before Defendant Darmony to

cancel the arrest warrant so he could go to a hospital and receive surgery on the cyst and save his life.

120.    Defendant Darmony ignored the plea, exploited his distress, sent investigators out to look for

him and harass him during his hospitalization and recovery. They arrested him in August 2013 when he

was still physically suffering and could not stand for more than a few minutes.  He was forced to walk

nearly a mile and stand 45 minutes for the hearing at the only hearing held on this matter, without even

allowing him counsel. The Debt Collections Office and Darmony knew about his medical problem.

121.    An attorney at the Debt Collections Office, seeing what was happening assisted Plaintiff

Weisskopf *pro bono*.  Weisskopf showed proof to Defendant Yahalomi that the purported debt was

fictitious, and that the family court was even holding over 19,000 shekels ($5,000) of his money in

escrow to guarantee future child support payments.  The amount in question was 16,000 shekels

($4,000).  Thus, sufficient funds were available with the court for the purported debt. Despite all this,

Defendant Yahalomi, without explanation or reason, demanded he pay an additional 4,000 shekels

($1,000) on the spot or Yahalomi would immediately order that Weisskopf be incarcerated without

adequate medical treatment.  Since he had no money because he was taken from a hospital bed to this

hearing, the police officers took him to borrow $1,000 on the black market.  They explained that the

black market allowed the Debt Collections Office to earn side money for "collections" off the record.

122.    Between August 2013 and December 2013, Plaintiff Weisskopf discovered that the Israeli

National Insurance also opened a file against him in the Debt Collections Office for child support that

he had already paid. (The National Insurance Institute is akin to the United States Social Security

Administration.)  Thus, the Debt Collections Office knew Plaintiff Weisskopf was being triple-billed

for child support, for which he had already paid.

123.    Defendant Darmony received Plaintiff Weisskopf's stolen American identity from his ex-wife

and kept possession of it under the pretense of "proving" he had substantial assets in the United States.

In reality, purpose of stealing Plaintiff Weisskopf's identity and illegally keeping possession of it was

to expand their extortion against him in the United States and exploit his elderly relatives as described herein.

124.    Plaintiff Weisskopf immediately objected to Defendant Darmony holding his stolen American identity in her possession and explained that it violates American law to be in possession of Plaintiff Weisskopf's stolen American identity without his permission and without permission from an American court.

125.    Defendant Darmony recklessly disregarded Plaintiff Weisskopf's objection, illegally kept his stolen American identity in her possession, and facilitated extortion and fraud to continue against him and against his family on American soil.

126.    There was a hearing in December 2013 in which Plaintiff Weisskopf's ex-wife did not appear. During that hearing, her lawyer wanted to bring in his elderly mother by telephone from the United States in as a witness without basis as such testimony was irrelevant.  Plaintiff Weisskopf objected because: (A) It violates the family court ruling dated 12/05/2009 not to harass his elderly parents. (B) His mother is elderly with a weak heart, (C) There was an expert's letter shown to Defendant Darmony explaining that Plaintiff Weisskopf's mother is mentally sick, (D) It is inhumane to require such a woman to stay awake all night for testimony at 4:00am her time, and; (E) Such harassment would traumatize both his parents and his grandmother and can cause any of them to be hospitalized or even death.

127.    Defendant Darmony continued the hearing to February 2014, giving over two months to properly file motions, affidavits, decisions, requesting the appearance of Weisskopf's mother and challenge the demand that she appear against an expert's opinion and valid court orders.

128.    At the hearing in February 2014, in violation of all procedural protections and practice, Defendant Darmony permitted Weisskopf's mother to be ambushed by his ex-wife, allowing his ex-wife herself to question and harass Weisskopf's mother. Weisskopf's ex-wife called in in the middle of the hearing when she decided she wanted to question and harass Weisskopf's mother. Moreover, the

hearing and taking of Weisskopf's mother's testimony was not done via video conference to allow the witness to be seen, and for the witness to observe the proceedings as required by Israeli law. Defendant Darmony claimed that this was done "for reasons of efficiency." Given the age and infirmary of Weisskopf's mother, and the fact that this hearing was subject to months of motion practice, there was ample time to follow the appropriate procedures, set up the video conference, have all parties physically in the room, and have only the attorneys question the witness in open court. Despite strenuous objections, Darmony proceeded in this extra-judicial and illegal manner. There simply was no reason to ignore proper procedure and valid requirements for "efficiency" under these circumstances. There was more than adequate time to follow standard procedure and there would be no prejudice to do so. Moreover, the time they took Weisskopf's mother's testimony was 4:00 A.M. her time, a wholly inappropriate time especially given her age. Upon information and belief, Defendant Darmony did not follow appropriate procedure simply because it would have led to a fair record which would not justify her sweeping, inappropriate and illegal rulings. And, after all these violations of protocol and procedure, when the record obtained did not support her rulings, she threw out the testimony completely.

129.   Defendant Darmony violated all appropriate practice and procedure in taking the testimony of an elderly woman who is an American citizen and resides exclusively in the United States, and therefore has no jurisdiction over, taking the absurd position "that the testimony of the parents is relevant and of great importance."   Weisskopf's mother does not live with him, and has not done so for years. There is and was no practical use for her testimony, as demonstrated by the fact that she force-fed taking said testimony, allowed wholly improper questioning to take place, and, when it did not yield the results she sought, threw it out in its entirety because it was irrelevant. Upon information and belief, Darmony allowed the testimony solely to coerce Weisskopf and further the scheme to extort funds from Plaintiffs herein.

130.   After the traumatic hearing in February 2014, Plaintiff Weisskopf's mother (then aged 72) and

grandmother (then aged 93) were both hospitalized. His mother underwent treatment for several months and his grandmother passed away in April 2014.

131.   Moreover, Defendant Darmony further harassed Weisskopf when his grandmother was on her deathbed. At that time, he sought relief in the form of lifting his ban on travel so he could visit her one last time and to and to follow Jewish custom of "sitting shiva" for her.  Instead, Defendant Darmony exploited the opportunity to extort more funds from Weiskopf, demanding that he pay 30,000 shekels (approximately $7,500) for no apparent purpose in order to go to his dying grandmother.

132.   Additionally, as a part and parcel of this scheme, court documents show that Defendant Darmony aided and abetted his ex-wife to steal Weisskopf's identity from for their own purposes to materially harm Weisskopf, deprive him of his assets and defame him. Moreover, Defendant Damony refused requests to return the wrongfully obtained documents or at least keep them under seal, and instead, left them in the public file as "evidence" against him to create the fictitious impression that Weisskopf held large sums of money in the United States which justified the arbitrary and excessive payments Darmony and Weisskopf's ex-wife were demanding.  It further left him and his family vulnerable to more fraud perpetrated against them wit this stolen American identity.

133.   When Plaintiff Weisskopf filed an appeal in September 2014, it fell into the hands of Defendant Yahalomi again. However, because the record on appeal and among the orders being appealed were Defendant Yahalomi's orders, she had a legal obligation to recuse herself as biased. Despite this requirement, she obstructed the appeal process and improperly charged Plaintiff Weisskopf prohibitive "fees" that the court had never charged him and eventually ordered returned to him upon discovery that such unauthorized fees had been charged against him.  In addition, Defendants Yahalomi and Darmony are close personal friends.

134.   Plaintiff Weisskopf brought the handling of his matter up to authorities seeking an investigation of the illegal and procedural irregularities which took place in his case, and, in writing, sought an investigation from Defendants Livni, Chamdani, and Moskowitz into the misconduct of Defendants

Yahalomi and Darmony.  At the time, Weisskopf was unaware of the scheme by these Defendants to extort funds from parents such as himself and fund raise using him and others like him as examples. Because it would interfere with their scheme, all three refused any investigation.

135.    Subsequently, Weisskopf was able to obtain a hearing in family court and away from the Debt Collections Office. The family court ruled that Defendants Yahalomi and Darmony were to return moneys Plaintiff Weisskpf deposited with them, ordered a retrial, and ordered cessation of all actions against him before retrial.

136.    Instead, Defendants Yahalomi and Darmony ignored and violated this valid court order. Not only did they refuse to return the money they were ordered to return, they took all the money in his bank account and intentionally leaving a negative balance in his bank account.

137.    During this period Defendant Zev Gabai joined the extortion racket in the Debt Collections Office after being trained in a program sponsored by the Defendant American Friends of Bar Ilan University.  Using the training he received, he obstructed any retrial as ordered by the court and instead returned the file to Defendant Darmony.

138.    In November 2015, in violation of the court order, Defendant Darmony issued a new arrest warrant against Plaintiff Weisskopf *ex parte* without any due process and without any hearing and ability of Weisskopf to be heard.  He is currently a homeless refugee due to the acts of Darmony and Yahalomi.

139.    While in hiding to avoid arrest due to the illegal and improper arrest warrant issued by Defendant Darmony, she, *sua sponte,* issued an order which wrongfully increased his deficiency from 16,000 shekels to 30,000 shekels, again despite a court order to release his funds and extinguish his debt, and to secure release of the escrow funds from court.  After deducting 19,000 shekels from 30,000 shekels, she increased his "debt" to 40,000 shekels and then added another 250,000 shekels to ensure he could never pay off the "debt" while holding his stolen American identity hostage. Thus, she has extorted substantial funds, confiscated all of Weisskopf's assets and kept him in hiding in violation

of valid court orders and in violation of all appropriate due process and procedural protections afforded by Israeli law and American law.

140.   For the past year, Defendant Darmony has been filing *sua sponte* and *ex parte* "motions" that she, herself hears and decides on behalf of Weisskopf's ex-wife which have the effect of depriving him of his freedom, assets and ability to appeal and obtain relief from a court because he is in hiding due to the illegal arrest warrant and has had his assets stripped from him.

141.   Finally, on June 29, 2016, Weisskopf was able to obtain an order from Darmony that she would follow the law, honor the court order and cancel the arrest warrant. However, she would only do so if Weisskopf would further pay her 5,000 shekels ($1,200).  At this time, because Darmony had stripped Weisskopf of his assets, he was an indigent and did not owe any funds. Indeed, he was owed funds from Defendants.

142.   In July 2016 Plaintiff Weisskopf again requested from Defendants Chamdani and Moskowitz to investigate Defendants Yahalomi's and Darmony's wrongful, illegal and damaging scheme to extort. They continued to obstruct any investigation.

143.   Since then Weisskopf has been arrested and spent several nights in jail while Darmony still keeps an arrest warrant open against him. Darmony refuses to recuse herself in this matter, which is on appeal, and the President of the Civil Court in Jerusalem has directed the State Prosecutor's Office to investigate this matter and report back to him.

## FACTS SPECIFIC TO PLAINTIFF ELIAHU

144.   Plaintiff Eliahu is the biological father of Karen Eliahu (age 21) and Joseph Eliahu (age 19) who are American citizens residing in California.  Both children are handicapped and continue to depend on him for their needs.

145.   Plaintiff Eliahu and his ex-wife settled permanently in California where they both have continuously lived since 1997.

146.    In 2003 they began divorce proceedings in the Superior Court of California for the County of Santa Clara where jurisdiction belonged exclusively.

147.    In 2007, the California Superior Court handed down final rulings as follows: A) awarded Plaintiff Eliahu full custody of both children; B) Ordered his ex-wife to pay approximately $1,300 per month in child support; C) Awarded him approximately $760,000 for his share in the marital assets.

148.    By 2008, his ex-wife fell behind in child support by approximately $25,000.

149.    Upon information and belief, his ex-wife turned to Defendants WIZO and Na'amat in the United States to circumvent her child support obligations under final court rulings in California.  They steered her to Tamar Paul-Cohen in Israel in order to wrongfully protect her own assets to the detriment of her children and Plaintiff Eliahu and, instead, extort money from Eliahu.

150.    In 2012 Na'amat, through its agents and accomplices in Israel, recruited Defendant Boltin in the Debt Collections Office, to act illegally but under color of law and wrongfully changed Plaintiff Eliahu's $760,000 award in California Superior Court. Instead, Na'amet and Boltin created a fictitious deficiency in child support owed to Eliahu's ex-wife, even though she did not have custody of the children, of $380,000. During this period, and to this day, Eliahu's ex-wife was not a resident of Israel and lived in California, United States of America. Thus, the Debt Collections Office never had jurisdiction over this matter.

151.    Eliahu had absolutely no assets in Israel nor resided in Israel. Thus, in furtherance of the scheme to extort funds from Eliahu, Defendant Boltin instead went after the assets of Plaintiff Eliahu's elderly mother, sister and her family. Even though they had nothing to do with this action and did not possess Eliahu's assets, Boltin, *sua sponte,* issued an order seizing all of the assets of Eliahu's relatives in Israel.

152.    Defendant Boltin automatically issued against Plaintiff Eliahu's extended family alongside him:

(A) An order freezing all bank accounts, (B) An order freezing all credit cards, (C) Garnishment on wages – including wages from his sister's children, (D) Excessive interest far beyond international norms, (E) Seized the business wholly owned by his sister and her husband.  All of this was without any warning or due process.

153.    In addition, they were required to pay $2,540 per month for two years in order to avoid arrest.

154.    Plaintiff Eliahu showed proof that the claim was illegal and requested Defendant Boltin cease and desist her extortion tactics.

155.    Instead of following the law, Defendant Boltin ignored his request and instead began foreclosure proceedings on the houses of his elderly mother and his adult sister without even trying to hide that the real agenda was to extort $380,000 out of him plus "interest and fees".

156.    In March 2013, his ex-wife purchased her current primary residence in Mountainview, CA for $1.4 million.  Thus, she had sufficient assets and was merely seeking to avoid paying what was due her children. Moreover, if she had a financial set back, she could have petitioned the United States courts for relief. Instead, she sought to shield her assets, with the knowledge and approval of Defendants in furtherance of their scheme to extort money from parents.

157.    In Israel, *sua sponte,* and without any legal or equitable basis, Defendant Boltin set an "eviction date" of December 6, 2013, thereby leaving them homeless if Eliahu did not pay the Debt Collections Office well over $380,000. Again, Eliahu's relatives played no role in any of the events of his divorce or the amounts owed to him, did not have custody of his children, and owed no money to the Debt Collections Office. The sole purpose of this eviction was to extort funds from Eliahu and force him to pay money not owed to the Debt Collections Office as a part of the extortion scheme.

158.    The trauma was so extreme that his 84-year-old mother's life was in danger and needed urgent medical attention as she slipped into delirium from the trauma.  Plaintiff Eliahu's sister emotionally

broke down, which caused a great strain on her own marriage and family. She continues to need psychiatric treatment to this day.

159. His sister stated in one of her e-mails to him, "I do not sleep at night and cannot function at all. Yesterday for the first time in history I forgot my laptop at home. I make mistakes at work and I have no idea what we are up against in the Debt Collections Office. I do not know when Mom will receive a letter in the mail saying that she must leave her home."

160. Since Plaintiff Eliahu did not want his elderly mother to die nor see his sister's entire family be ruined; he was forced to sell his own home to pay off the Debt Collections Office. This left Plaintiff Eliahu, a single parent in California, homeless with both of his children.

161. Upon information and belief, Defendant Boltin kept a portion of the funds sent for herself and sent the rest back to his ex-wife in California. However, they claimed the money did not arrive to the Debt Collections Office before the deadline on December 6, 2013. Thus, while the eviction did not take place, penalties were added to the extortionate charges. The eviction was put off until April, 2014 and monthly penalties were added until that date.

162. On April 2, 2014, the Debt Collections Office confirmed receipt in Israel of 1.75 million shekels (approximately $440,000) that Plaintiff Eliahu had sent. However, Defendant Boltin, *sua sponte,* and wrongfully and illegally sought to keep Eliahu "on the hook" for further extortion by refusing to release jurisdiction, which it never had in the first place, of the matter. Instead, created additional false deficiencies by adding 20,000 shekels (approximately $5,000) in "attorney's fees" plus 47,000 shekels (approximately $12,000) in made-up "administrative fees".

163. From April 2013 through August 2013 Plaintiff Eliahu had to borrow from his family in order to keep up with all of Defendant Boltin's arbitrary demands. Nonetheless, Eliahu was able to pay of the entirety of the purported and false delinquency, including the fictitious fees.

164.    That, however, was insufficient for Defendants. They still needed his example to raise money off of, Thus, Defendant Boltin decided to create additional owed funds by recalculating the dollar-shekel exchange rate at 4.1 shekels to the dollar, well above the exchange rate at the time. Indeed, the exchange rate has not been that high since 2006, one year before the California Superior Court handed down its rulings in Plaintiff Eliahu's favor.  In doing so, Defendant Boltin effectively created an additional $57,142 out of thin air to add to the delinquency to keep the case open.

165.    In total, Plaintiff Eliahu Defendants extorted approximately $800,000 in less than two years from Eliahu and turned a debt owed to him into a debt owed to others. What is particularly egregious about Defendants' behavior is that the debt in question is for the purpose of supporting Eliahu's children but was, in fact, taken from the parent that is raising them and given to, among others, the parent that abandoned them, thus injuring those very children and leaving them with less money solely to compensate a very wealthy ex-wife.

166.    These funds went from California to Israel without any jurisdictional basis whatsoever.  There the Debt Collections Office and Defendants kept a portion for their own use and sent the balance Plaintiff Eliahu's ex-wife who resides in California where the funding originated in the first place.

167.    To this day, he has neither recovered financially nor emotionally from this ordeal while his ex-wife has approximately $2 million in assets.

168.    These activities clearly demonstrate the international scope and direction of Defendants' scheme. Defendants are all part of a large international racketeering network with long arms to reach Plaintiff Eliahu's entire family and him anywhere in the world and they will not hesitate to put any of them in the grave literally to extort any amount of money they want

169.    To this day, Plaintiff Eliahu suffers and has been diagnosed with PTSD solely because of the extreme trauma he suffered from the racketeering scheme described above.

## FACTS SPECIFIC TO PLAINTIFF SILBERMAN

170.   Plaintiff Silberman is the biological father of a Minor (age 9).

171.   He has been divorced for almost 8 years.

172.   When Plaintiff Silberman got divorced; his ex-wife opened a file in the Debt Collections Office for child support and he has timely and completely paid child support to his ex-wife since then.

173.   After his divorce, Plaintiff Silberman went back to the United States and sent the monthly payments to Israel using American payment instruments without missing a single payment.

174.   Almost 4 years ago, he came to Israel on a visit and ever since the Debt Collections Office and Defendants have attacked Silberman and blocked his ability to leave Israel.

175.   Plaintiff Silberman found that in February 2013 Defendant Bergman, without notice to Silberman, without a hearing or affording Silberman with an opportunity to be heard, issued a stop-order preventing him from leaving Israel unless he were to pay 200,000 shekels (approximately $50,000) for "advance payments" until his child turns 18. There is no basis for the demand for this payment since Silberman is not and has never been in arrears on his child support payments. Moreover, there was no basis for blocking Silberman's ability to leave Israel. Indeed, blocking his ability to leave severely restricted his ability to continue to pay support because he earned his living, his assets, and his entire center of life were not in Israel but the United States.

176.   Since February 2013 Defendant Bergman issued: (A) A stop-order from leaving the country against him, (B) An order freezing all bank accounts, (C) An order freezing all credit cards, (D) Garnishment against all income, (E) Order against issuing him a passport, (F) Excessive interest far beyond international norms, (G) A warrant for his arrest.  All of this was without any warning, notice, hearing, or due process.

177.   As a result of these extra-judicial and illegal orders, Silberman became depressed.

178.    One night a policeman, without knocking, nearly kicked in his mother's door to arrest him in the middle of the night over a fictitious interest delinquency created through the manipulation by Defendants, and specifically Defendant Bergman of his "debt".  His mother is a 90 year-old Holocaust survivor who had a flash back to her days in Nazi Europe and was traumatized.

179.    He arrested Plaintiff Silberman in front of her – causing her extreme trauma she had not experienced since the Holocaust.

180.    After a few hours at the police station, the police officer told him he would release Plaintiff Silberman to his elderly mother if she were to sign a "promissory note" that Plaintiff Silberman would pay off "interest" to the Debt Collections Office within 24 hours. Thus, Silberman was forced to, and did sign the note and pay the extortion based upon the fictitious "interest."

181.    After that ordeal, Plaintiff Silberman found out that Defendant Bergman still had the stop-order in place preventing him from leaving Israel and going back to America where he lived for about 25 years.

182.    Defendant Bergman forced Silberman and his mother to remain in Israel, almost as if they were hostages. The only way out was to pay money to and "buy off" the Defendants' network.

183.    Since he did not want to see his mother suffer or die from extortion tactics, he had to borrow over $50,000 on the black market in August 2016 to buy his release from the stop-order preventing him from returning to his home in the United States after four terrifying years held prisoner in Israel.

184.    Plaintiff Silberman is now a refugee in the United States and hopes to find a way to pay off the debt he incurred on the black market to buy his release from Defendant Bergman's racketeering network.  However, he fears every day for his elderly mother's life in Israel because Defendant Bergman and the other Defendants continue to harass here and other relatives of his in Israel and demand payments from him to temporarily leave them alone.

## FACTS SPECIFIC TO PLAINTIFF GIDON

185.    Gidon is a manager at a large pharmaceutical corporation, Teva Pharmaceutical, and a retired member of the Israeli Air Force.

186.    On or about May 18, 2014, Gidon decided to end his relationship with his ex-wife and informed her that he was moving back to the United States. He began packing that day to do so.

187.    Shortly thereafter, she went to Defendant Darmony at the Debt Collections Office and, without any basis, claimed a failure to pay child support in the amount of 400 shekels (approximately $100). This filing was fictitious.

188.    Immediately, without any hearing, or due process, s*ua sponte,* and *ex-parte,* she issued an order which: (A) froze all of his bank accounts, (B) froze all of his credit cards, (C) ordered the garnishment of fully one hundred percent (100%) of his wages, far more than was falsely portrayed as the deficiency, (D) ordered that usurious interest be paid on the delinquency.

189.    Upon learning of the filing, Gidon provided proof and evidence to Darmony that he was not delinquent on any of his child support payments. Instead of rescinding the order and closing the file, Darmony, *sua sponte*, and without any legal or other basis, increased the amount of the child support payment by adding 2,500 shekels per month to the amount for four (4) months, until the total reached 10,471 shekels with interest (approximately $2500). Using this increased amount as the basis for a delinquency, she kept the Order in place against Gidon.

190.    In addition to garnishing 2,500 shekels per month, Darmony also seized Gidon's retirement funds in their entirety.

191.    Plaintiff Gidon, through his mother and by borrowing from her, made all payments ordered by Darmony.

192.    Indeed, at a certain point Gidon's ex-wife, sent a notice to the Debt Collections Office, and

specifically Defendant Darmony that all delinquencies were fully paid and no debt was owed. She specifically requested that the file be closed and the Debt Collections Office cease its efforts on her behalf.

193.   Nonetheless, Defendant Darmony saw to it that the Debt Collections Office record reflect that Gidon was still delinquent in the amount of 60 shekels so she could maintain the orders against him. In addition, she also issued an order which prevented Gidon from leaving Israel.

194.   Then, in order to form the basis for additional sanctions against Gidon, Darmony and/or Darmony's associates and agents, convinced Gidon's ex-wife to move into a battered women's shelter, even though Gidon had not injured her in any way, physically or psychologically, and was no longer living with her.

195.   Due to this move, Defendant Darmony instructed Alona Sadeh, another enforcement official at the Debt Collections Office, to open a file against Gidon for a fictitious delinquency in the amount of 84,194 shekels (approximately $21,000) plus a penalty of 1,000 shekels (approximately $250) per day.

196.   Sadeh also re-issued the orders freezing the bank accounts and credit cards of Gidon as well as garnishing one hundred percent of his wages and charging usurious interest. This was done *ex-parte* and without hearing or due process.

197.   Further, Defendant Darmony and/or Sadeh convinced yet another enforcement official at the Debt Collections Office, Noa Regev, to open yet a third delinquency file as to Gidon, claiming an ongoing and fictitious 400 shekels (approximately $100) balance, a charge of 3,000 shekels ($750) per month and a continuing deficiency of 60 shekels regardless of the amounts paid by Gidon. Even when the files demonstrate that Gidon has no deficiency, Defendants continue to claim interest and fees owed to keep the orders in place and the file open.

198.   In addition, Regev also garnished all of Gidon's salary for two months and had him arrested

fifteen (15) times. Due to these arrests, Gidon lost his security clearance and can no longer serve in the military reserves, decreasing his income by ten percent (10%).

199.    In part, due to the trauma created by the above events, Minor Y attempted suicide while in kindergarten class.

## FACTS SPECIFIC TO PLAINTIFF YAKOV BOSSIRA

200.    Plaintiff Bossira is an electrical engineer with a Phd. in Computer Science and Engineering. He has, over the years, worked for several engineering firms, including his own, in areas related to clean technology engineering and robotics.

201.    In 2005, Bossira and his wife were having marital issues. His wife went to Defendant Na'amat for marriage counseling. At the time, Bossira had assets both in Israel and overseas. When she disclosed the amount and nature of my assets to them, Na'amet convinced her that he was going to abandon her and seek refuge overseas.

202.    Na'amet, solely for its own purposes and to profit from Bossira, convinced his then-wife to file a false complaint with the police and obtain an injunction preventing him from leaving Israel.

203.    As a direct result, Bossira lost a material amount of work for his business, as his business required him to be able to travel overseas to work on and oversee projects.

204.    In addition, Na'amat made his ex-wife paranoid, leading to their divorce. Three years later, without Na'amat's interference, they remarried. Upon information and belief, had Na'amat not interfered in their relationship in the first place, they never would have been divorced.

205.    Upon their divorce, at Na'amat's behest, Bossira's then ex-wife sought child support through the National Insurance Institute. The National Insurance Institute is akin to the United States Social Security Administration.

206.    Then, again at Na'amat's instruction, she opened a delinquency claim in the Debt Collections

Office. Defendant Bergman was the assigned person. The National Insurance Institute similarly opened a file against him in the Debt Collections Office and Defendant Yalumi was assigned that file.

207.    Without basis or due process, or even an opportunity to pay the support, Bergman immediately issued an order freezing his bank accounts and credit cards, garnish his wages, revoke his driver's license, and charge him with usurious interest rates. In addition, an arrest warrant was issued against him due to claims that he owed an additional 200 shekels.

208.    On March 13, 2008, the Israeli Family Court issued an order striking the two claims because Bossira was not, in fact, delinquent, and ordered a return of the funds paid.

209.    Despite that order, the funds were not repaid. Thus, Bossira appealed through the Debt Collections Offices to have Defendants Yalumi and Bergman comply with the order, and, ultimately, on November 18, 2008, the Debt Collections Office instructed Defendants Yalumi and Bergman to comply with the order.

210.    Nonetheless, Defendants Yalumi and Bergman issued another order freezing Bossira's bank accounts and credit cards, garnished his wages, revoked his driver's license and charged usurious interest due to a new filing from the National Insurance Institute claiming a false delinquency of 35,000 shekels.

211.    Shortly after this period, he remarried his wife and then, several months later, again divorced from his wife.

212.    At the behest of WIZO and Na'amat, his ex-wife again went to the Debt Collections Office and Yalumi and Bergman reopened the old files and "reactivated" the prior false debts. It was improper for them to do so because Bossira was not in default on any support payments and, in fact, had custody of his children and therefore could not owe child support.

213.    Nonetheless, Yalumi and Bergman once again froze his bank accounts and credit cards,

garnished his salary, charged him usurious interest rates and froze his driver's license.

214.    Over the course of three years, Defendants Yalumi and Bergman succeeded in seizing virtually all his assets.

215.    As a result, when the Debt Collections Office finally rescinded the orders because they were wrongfully issued, it nonetheless did not return the funds taken and instructed WIZO and/or Na'amat to take his children to their boarding school, at his expense, under the  theory that he did not have sufficient funds to provide for them.

216.    At Na'amat's behest, his ex-wife filed for a "retroactive" delinquency of 45,000 shekels with the Debt Collections Office, which included purported payments for the period they were remarried.

217.    On July 8, 2010, Bossira moved to have the file closed because he was not, in fact, delinquent on his payments of child support. On September 5, 2010, Defendant Bergman, at a hearing, refused to close the file and, in fact, waited until February 19, 2012 for his ex-wife to respond to the motion.

218.    Instead, she issued an order freezing his assets and credit cards, barring him from leaving Israel, garnishing wages, charging usurious interest and revoked his driver's license.

219.    On June 8, 2012, Defendant Bergman ordered Bossira to pay, on the spot, 45,000 shekels or she would order his immediate arrest. He paid under duress.

220.    Despite completing the payment in full, as above, she nonetheless kept the file open at a zero balance, and obligated monthly unauthorized payments from him.

221.    Thus, he has been subject to extortion in these payments until August, 2013 when the Family Court transferred the children to his sole custody.

222.    Despite him having sole custody, tDefendant Bergman and Yalumi continued to charge the unauthorized monthly payments until February 1, 2015, Defendant Bergman closed the file.

223.    They never repaid the money and he was left penniless.

224.    Then, as if that were not enough, in February, 2016 they took his children away and sent them to Defendants WIZO and Na'amat ostensibly because he lacked funds to support them.

225.    WIZO and Na'amat are being paid 17,000 shekels per month each and he is being billed for it, although he cannot pay.

**COUNT ONE**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(All Plaintiffs v. Israeli Defendants)**

226.    Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

227.    Plaintiffs bring this claim for negligent infliction of emotional distress against Defendants Livni, Moskowitz, Chamdani, Darmony, Yalumi, Boltin, Gilead-Meshulam, Bergman, Gabai, Lagana, Regev, Saleh (the Israeli Defendants) because the Israeli Defendants facilitated, assisted, aided, abetted, materially supported, and incentivized acts of extortion against divorced men in Israel – including the Plaintiffs.

228.    The Israeli Defendants knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets.

229.    The Israeli Defendants intended or knew or upon reasonable reflection or investigation should have known, that their conduct would lead to the death of or injury to innocent persons and resulting severe emotional distress.

230.    The Israeli Defendants intended, knew, or should have known that the commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets would create grief, devastation and emotional injuries.

231.    The actions of the Israeli Defendants were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those tortured and abused, and the extended family members, especially children and the elderly.

232.    As a direct and proximate cause of intentional misconduct and/or reckless disregard for human life of the Israeli Defendants; Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

233.    The Israeli Defendants, by engaging in this unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

234.    As a proximate result of Defendants' acts or omissions Plaintiffs suffered the damages described.

235.    As a further proximate result of Defendants' acts and the consequences proximately caused by them, as hereinabove alleged, Plaintiffs suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

236.    To date Plaintiff Newman lost over $300,000; spent over $20,000 on legal expenses, over $10,000 on therapy spent over 1,000 hours, loss of work at $60,000 per year, is now impoverished without his former assets.

237.    Plaintiff Zamansky lost over $50,000; was disengaged from his child over a year, spent over $20,000 on legal expenses, over $5,000 on therapy spent over 1,000 hours, is now impoverished without his former assets.

238.    Plaintiff Weisskopf lost over $1 million; was disengaged from his children over a year, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career at $60,000 per year, is now impoverished without his former assets.

239.    Plaintiff Eliahu lost over $1 million, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career exceeding $50,000 per year, is now impoverished without his former assets.

240.    Plaintiff Silberman lost over $50,000; was disengaged from his child for several years, spent over $20,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career over $50,000 per year, is now impoverished without his former assets.

241.    Plaintiff Gidon lost over $250,000; was disengaged from his child for over one year, spent over over $10,000 on therapy spent over 1,000 hours, decrease in wages over $10,000 per year, is now impoverished without his former assets.

242.    Plaintiff Bossira lost over $5 million; was disengaged from his children for several years, spent over $100,000 on legal expenses, over $30,000 on therapy spent over 1,000 hours, loss of career over $500,000 per year, is now impoverished without his former assets.

243.    The emotional distress suffered by Plaintiffs was serious or severe. Each of the Plaintiffs has and/or is undergoing psychological and/or psychiatric treatment.

244.    Plaintiffs were injured by the actions of the Defendants, including false arrests and baseless detentions, a massive libelous "character assassination", extended periods of disengagement from children, Post Traumatic Stress Disorder, sleep deprivation, heightened emotional nervousness, suicidal tendencies, need for painkillers and medications, loss of wages or earning capacity, loss of job, loss of reputation, and actual impoverishment.

**WHEREFORE**, Each Plaintiff requests judgment in his favor and against each of the Israeli Defendants in an amount in excess of $5,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and an Order to prevent the Israeli Defendants from ever again violating rights and intentionally undertakings in violation of the law of nations.

## COUNT TWO
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (All Plaintiffs v. Israeli Defendants)

245.   Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

246.   Plaintiffs bring this claim for negligent infliction of emotional distress against the Israeli Defendants because the Israeli Defendants facilitated, assisted, aided, abetted, materially supported, and incentivized acts of extortion against divorced men in Israel – including the Plaintiffs.

247.   The Israeli Defendants knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets.

248.   The Israeli Defendants intended or knew or upon reasonable reflection or investigation should have known, that their conduct would lead to the death of or injury to innocent persons and resulting severe emotional distress.

249.   The Israeli Defendants intended, knew, or should have known that the commission of acts designed to violate the rights of men, impoverish them, arrest them, lower their self-esteem and disengage them from their children and assets would create grief, devastation and emotional injuries.

250.   The actions of the Israeli Defendants were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those tortured and abused, and the extended family members, especially children and the elderly.

251.   As a direct and proximate cause of intentional misconduct and/or reckless disregard for human life of the Israeli Defendants; Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

252.    The Israeli Defendants, by engaging in this unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

253.    As a proximate result of Defendants' acts or omissions Plaintiffs suffered the damages described.

254.    As a further proximate result of Defendants' acts and the consequences proximately caused by them, as hereinabove alleged, Plaintiffs suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

255.    The emotional distress suffered by Plaintiffs was serious or severe.

256.    Plaintiffs were injured by the actions of the Defendants, including false arrests and baseless detentions, a massive libelous "character assassination", extended periods of disengagement from children, Post Traumatic Stress Disorder, sleep deprivation, heightened emotional nervousness, suicidal tendencies, need for painkillers and medications, loss of wages or earning capacity, loss of job, loss of reputation, and actual impoverishment.

**WHEREFORE**, Each Plaintiff requests judgment in his favor and against each of the Israeli Defendants in an amount in excess of $5,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and an Order to prevent the Israeli Defendants from ever again violating rights and intentionally undertakings in violation of the law of nations.

## COUNT THREE
### AIDING AND ABETTING VIOLATIONS OF RICO
### (Plaintiffs v. Fund Raising Defendants)

257.    Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

258.    Defendants NIF, IFCJ, Summers, Hagee, Royer, JIJ, WIZO, Na'amat, PEF, AFBIU, JAFNI, and JAFI finance enterprises in Israel that support, promote, and lobby for torturous extortion of divorced men and their families the Plaintiffs.

259.     Defendants Summers, Hagee, Royer, IFCJ, and JIJ collect donations from Evangelical Christians; who themselves believe in the sanctity of marriage, preserving the traditional family, and the importance of fathers in the lives of their children – and use a portion of those donations to support breaking up families and extorting divorced fathers thereafter.

260.     Defendants NIF, WIZO, Na'amat, PEF, JAFI, AFBIU and JFNA collects donations from Jewish communities all over North America and use a portion of those donations to support breaking up families and extorting divorced fathers thereafter.

261.     The Fund Raising Defendants do not tell their donors that part of their monies go to enterprises in Israel that exploit divorce to brutally extort billions out of divorced fathers and contribute to the growing number of loss of Jewish lives by suicide.

262.     The Financial Defendants knowingly, intentionally, and purposefully, directly and indirectly, aided and abetted, intentionally facilitated, and/or recklessly disregarded and participated in the racketeering activities alleged herein.

263.     The Fund Raising Defendants aided and abetted crimes knowingly giving money to Israeli enterprises for purposes of annihilating the ability of divorced fathers in Israel to survive.

264.     At all times, the Fund Raising Defendants knew the receipt, transfer, and disbursement of charitable funds were being paid to enterprises that carried out ferocious extortion against the Plaintiffs and other men in Israel, contrary to the beliefs of the donors themselves.

265.     The Fund Raising Defendants aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of these crimes by providing organized and systematic financial support and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes, with the knowledge and purpose that such actions would assist racketeering activities in Israel with funding from the United States.

266.     Upon information and belief, the Fund Raising Defendants regularly provided substantial funding, exceeding $1 billion in private contributions and charitable donations, with actual knowledge

and awareness that these same funds were raised and deposited for the purpose of racketeering activities against the Plaintiffs and other innocent men in Israel.

267.   Actions by the Fund Raising Defendants directly and materially contributed to the institutionalized discrimination which Plaintiffs and other similarly situated individuals suffered in tribunal proceedings in Israel.

**WHEREFORE**, Each Plaintiff requests judgment in his favor and against Defendants NIF, IFCJ, Summers, Hagee, JIJ, WIZO, Na'amat, PEF, JAFNI, JAFI, each in an amount in excess of $5,000,000 plus interest, costs, punitive damages, attorney's fees and such other relief as the Court may determine and further request an Order preventing the Financial Defendants from ever again engaging in the financing of violations against humanity and torture in violation of the law of nations.

## COUNT FOUR
## CIVIL VIOLATIONS OF THE
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (All Plaintiffs v. All Defendants)

268.   Plaintiffs repeat and reallege all previous allegations with the same force and effect, as if fully set forth herein.

269.   From prior to 2012 and to the present, all Defendants and/or their agents and co-conspirators formed a massive RICO enterprise within the meaning of 18 U.S.C. 1961(4) engaged in foreign and/or interstate commerce. The Debt Collections Office constitutes a criminal enterprise within the meaning of RICO, and the Defendants, by and through the Debt Collections Office, are a criminal association in fact engaging in the crimes and acts alleged herein.

270.   Alternatively, Defendants and/or their agents & co-conspirators constituted a massive association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged.  This association in fact constituted an enterprise within the meaning of 18 U.S.C. 1961(4).

271.   Each Defendant is an "individual or entity capable of holding a legal or beneficial interest

in property" and, as such, each constitutes a "person" within the meaning of 18 U.S.C. 1961(3).

272.   Over a period of years and continuing to the present, Defendants with their agents and/or co-conspirators, in violation of 18 U.S.C. 1962(b) through a pattern of racketeering activity, have acquired and maintained an interest in the Debt Collections Office.

273.   At all times relevant to this Complaint, the Defendants and/or their agents & co-conspirators conducted, or participated directly or indirectly in the conduct of affairs in violation of 18 U.S.C. 1962(c) and (d) combined and conspired with their agents and/or co-conspirators to commit conduct the affairs of the enterprise through a pattern of racketeering activity.

274.   In furtherance of the conspiracy, and to effect the objects thereof, the Defendants committed overt acts as set forth herein.

275.   The pattern of racketeering activity alleged above include the following specific acts, all of which are set forth in the specific numbered paragraphs herein which are realleged and incorporated here by reference as if fully set forth, as follows: a) bribery; b) wire fraud; c) mail fraud; d) financial institution fraud; e) obstruction of justice; f) witness tampering; g) retaliations against victims; h) unlawful welfare fund payments; i) money laundering; j) unlawful debt; k) fraud; l) torture, m) extortion, n) embezzlement from pension funds, o) identity fraud, p) interference with commerce, q) slavery.

276.   As a direct and proximate result of Defendants' violations of 18 U.S.C. 1964(c) each Plaintiff suffered injury to his business and/or property.

277.   The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendants as the natural consequences of Defendants' acts.

278.   Pursuant to 18 U.S.C. 1964(c) each Plaintiff is entitled to threefold the damages identified herein from each Defendant.

**WHEREFORE**, pursuant to the statutes at 18 U.S.C. 1964(a) and (c), each Plaintiff requests judgment against all named Defendants as follows: (1) Declaration that the Jewish Agency for Israel, the Jewish

Federations of North America, WIZO – Women's International Zionist Organization, Na'amat, PEF Israel Endowment Fund, New Israel Fund, Jerusalem Institute for Justice, International Fellowship of Christians & Jews, and הוצאה לפועל (the Israeli Debt Collections Office) are together a RICO organization. (2) Declaration that Defendants Summers and Hagee are aiders and abettors of a RICO organization. (3) Accounting of all ill-gotten monies in the past 10 years and its disgorgement to the donors. (4) Compensation from each Defendant, jointly and severally to the Plaintiffs who were subjected to the torture by the Israeli Defendants within the past 10 years in an amount exceeding $5 million. (5) Compensation from the Financial Defendants in an amount exceeding $75,000 each.  (6) Punitive damages from all Defendants in the amount of $1 billion to set up a victim rehabilitation fund for similarly situated victims, and (7) An injunction enjoining the fundraising by any Defendants in the United States.

## COUNT FIVE
### EXTORTION
### (All Plaintiffs against All Defendants)

279.    Plaintiffs repeat and realleged each and every allegation contained in Paragraphs 1 through 255 as if set forth herein.

280.    Defendants, through the acts alleged herein, through the threat of force and under the color of official right, threatened Plaintiffs with loss of assets and income, prison, loss of the ability to see their children, and loss of their ability to travel, or actually wrongfully enforced these threats on Plaintiffs, in order to be paid monies not owed to them or due them.

281.    These acts forced Plaintiffs to pay monies not due Defendants to Defendants to the detriment of Plaintiffs and for the profit of Defendants.

282.    None of the amounts extorted was actually due and owing and were the creation of Defendants and the Bailiffs Office. Plaintiffs have been damaged thereby.

**WHEREFORE,** Plaintiffs seek judgment against Defendants for damages due the extortion alleged herein, and for such other and further relief as to this Court may be just, equitable and proper.

## COUNT SIX
## MAIL FRAUD
### (All plaintiffs against Fund Raising Defendants)

283.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 259 as if set forth more fully herein.

284.   As set forth above, the Fund Raising Defendants, through the use of the United States mail and other forms of communication, sent to persons, including plaintiffs, materially false and misleading information that they knew or should have known was materially false and misleading for the purpose of convincing them to send money to the Fund Raising Defendants under false pretenses.

285.   In doing so, the Fund Raising Defendants are in violation of 18 U.S.C. 1341 et. seq. and 18 U.S.C. 1343 in that they, through the use of the mails and electronic communication, defrauded Plaintiffs and others in that they misrepresented the use and purpose of the monies donated by Plaintiffs and others.

**WHEREFORE,** Plaintiffs seek judgment against Defendants for damages due the violations of 18 U.S.C. 1341 and 18 U.S.C. 1343 as alleged herein, and for such other and further relief as to this Court may be just, equitable and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.                                        Dated:  January 23, 2017.
Respectfully submitted by:

| | | |
|---|---|---|
| Dotan Newman | Michael Zamansky | r/R. David Weisskopf |
| Rachel 7/1 | P.O. Box 31913 | R. David Weisskopf, pro se |
| Tel Aviv, ISRAEL 6404708 | Jerusalem, ISRAEL  94101 | P.O. Box 33050 |
| 011-972-54-233-6357 | 011-972-52-620-0995 | Jerusalem, ISRAEL  94130 |
| | | (847) 230-4756 |
| Eitan Eliahu | Dan Silberman | |
| 7162 Galli CT | 6A Yizchak Ave | |
| San Jose, CA 95129 | Haifa, ISRAEL  34482 | |
| (650) 823-5028 | 011-972-53-728-5770 | |
| Yakov Bossira | Eldad Gidon | |
| 7 Palmach St. | P.O. Box 9133 | |
| Haifa, Israel | Jerusalem, Israel | |
| 011-972-52-437-1075 | 011-972-54-888-7109 | |